STATE of Minnesota, Respondent,

v.

Erika Lynn DIEDE, Appellant.

No. A09–1120.

Supreme Court of Minnesota.

March 30, 2011.

838

Lori Swanson, Attorney General, Kimberly R. Parker, Assistant Attorney General, St. Paul, Minnesota, for respondent.

David W. Merchant, Chief Appellate Public Defender, Jessica Merz Godes, Assistant State Public Defender, St. Paul, Minnesota, for appellant.

## OPINION

MEYER, Justice.

Appellant Erika Diede was charged with fifth-degree possession of a controlled substance as the result of a search and seizure conducted after the police had arrested the passenger of a truck she was driving. Before trial, Diede moved to suppress evidence of possession of methamphetamine on the basis that it was the result of an illegal search and seizure. The district court denied the motion, held a trial on stipulated facts, and found Diede guilty of fifth-degree possession of a controlled substance. The court of appeals affirmed. Diede brought this appeal, arguing that the police conduct was not justified by reasonable articulable suspicion of criminal activity and that she did not voluntarily consent to a search of her cigarette package. In addition to challenging Diede's arguments, the State asserts that we should affirm the district court's denial of Diede's suppression motion because the methamphetamine would inevitably have been discovered through lawful means. We reverse.

The parties stipulated to the following facts. On April 22, 2008, Otter Tail County Detective Rod Jensen, driving an unmarked police car, was conducting sur-

veillance of Jason Hanson's residence. Detective Jensen planned to make "a probable cause arrest on Hanson for previous narcotics sales."[1] At about 4:09 p.m., Hanson and Erika Diede, both of whom Detective Jensen recognized, left the residence in a gray Chevrolet pickup truck. Detective Jensen called for backup and followed the truck as Diede drove it to the trailer home where Diede and John Hanson lived. As Detective Jensen followed the truck, he checked the truck's license plate and found that the plate, which was registered to John Hanson, was for a red Mazda truck, not a gray Chevrolet.

After the truck and Detective Jensen arrived at the trailer home, Detective Jensen got out of his car. Detective Jensen saw Hanson open the passenger door, turn his legs out of the vehicle, look in Jensen's direction, and move his right hand as if reaching in his pocket. It appeared to Detective Jensen that as Hanson got out of the truck, Hanson tossed something back onto the truck seat. Diede remained in the truck, talking on her cell phone.

Detective Jensen approached the truck and arrested Hanson. Diede got out of the truck about 30 seconds later. Detective Jensen told her to stay where she was and that he needed to speak with her. At roughly the same time, two special agents from the West Central Minnesota Drug Task Force (WCMDTF) and a sheriff's deputy with a police dog arrived. The deputy put Hanson in the deputy's squad car.

Detective Jensen asked Diede if she had seen Hanson throw anything into the vehicle. She replied that she had not. Detective Jensen noticed that Diede kept her hands in her sweatshirt pockets. When he asked what she had in her pockets, Diede

replied that she had a package of cigarettes and a lighter, and pulled both out of her pockets. Detective Jensen, who knew from his experience and training that drugs are sometimes concealed in cigarette packages, asked if he could look inside the cigarette package. Diede replied that he did not have any right to do so.

Special Agent Haberer of the WCMDTF approached Diede and Detective Jensen. He noticed that Diede seemed nervous and asked Diede to turn out her pockets. Diede did so. Special Agent Haberer asked if she had anything else. Diede produced a cigarette package. At this point, the two police reports differ. According to Detective Jensen's report, she immediately flipped open the top of the cigarette package. According to Special Agent Haberer's report, Detective Jensen asked Diede to open the cover and she complied. The reports agree that the open package revealed the ends of a plastic baggie and that Diede quickly closed then started to crush the box. Detective Jensen and Special Agent Haberer physically restrained her and pried the cigarette package out of her hand.

Diede was handcuffed and told that she was under arrest. She asked if she could get some money from inside the trailer home so that she could buy a calling card when she arrived at the jail. Special Agent Haberer agreed. He and another agent followed her into the home, where he saw a marijuana pipe in plain view. Special Agent Haberer told Diede that he could get a search warrant based on the pipe, asked if she had any other illegal items, and Diede handed over a glass methamphetamine pipe.

After Diede and Special Agent Haberer left the home, Detective Jensen asked Die-

---

1. The record does not indicate whether a warrant had been issued for Hanson's arrest or whether there was any formal determination of probable cause.

de about the mismatched license plate. She said that they had just switched over the license plates three days earlier. Detective Jensen and Special Agent Haberer accompanied her back into the home where she produced the appropriate paperwork.

A field test later confirmed that the baggie found in Diede's cigarette package contained methamphetamine and weighed 0.3 grams. Diede was charged with fifth-degree possession of a controlled substance based on the methamphetamine.

Diede moved to suppress the methamphetamine evidence, arguing that she was illegally seized and that the police illegally expanded the scope of her detention. The district court denied the motion. Following the order, the parties submitted the case to the court under stipulated facts based on the two police reports.[2] The court found Diede guilty and sentenced her to ten years probation. Diede appealed. The court of appeals affirmed. *See State v. Diede,* No. A09–1120, 2010 WL 1541335, at *4 (Minn.App. Apr. 20, 2010). Diede filed a petition for review, which we granted.

Diede argues that the district court erred in not suppressing the methamphetamine evidence because (1) when the police officers seized Diede, the police did not have an objectively reasonable suspicion that she was involved in criminal activity, and (2) she did not consent to the search of her cigarette package. In addition to challenging Diede's arguments, the State asserts that we should affirm the district court's denial of Diede's suppression motion because the methamphetamine would inevitably have been discovered through lawful means.

## I.

We first address Diede's argument that the police failed to articulate a reasonable suspicion that she was involved in criminal activity at the time she was seized. The parties agree that the police seized Diede when Detective Jensen told her to remain next to the truck and that he needed to speak with her.

The United States and Minnesota Constitutions protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *accord* Minn. Const. art. I, § 10. Under the principles set out by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may temporarily detain a suspect without probable cause if (1) "the stop was justified at its inception" by reasonable articulable suspicion, and (2) "the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *State v. Askerooth,* 681 N.W.2d 353, 364 (Minn.2004) (citing *Terry,* 392 U.S. at 19–21, 88 S.Ct. 1868). Evidence obtained as a result of a seizure without reasonable suspicion must be suppressed. *See, e.g., State v. Harris,* 590 N.W.2d 90, 97 (Minn.1999); *State v. Cripps,* 533 N.W.2d 388, 391 (Minn.1995).

*Terry* allows a police officer to "stop and temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity." *Cripps,* 533 N.W.2d at 391. Reasonable suspicion must be "based on specific, articulable

2. The parties described the process as a trial on stipulated facts. *See* Minn. R.Crim. P. 26.01, subd. 3. The court described the process as a *Lothenbach* plea hearing. *State v.* *Lothenbach,* 296 N.W.2d 854 (Minn.1980), was superseded by Minn. R.Crim. P. 26.01, subd. 4, which the process at the district court most closely resembles.

facts" that allow the officer to "be able to articulate at the omnibus hearing that he or she had a particularized and objective basis for suspecting the seized person of criminal activity." *Id.* The reasonable-suspicion standard is "not high." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (internal quotation marks omitted). But although it is "less demanding than [the standard for] probable cause or a preponderance of the evidence," reasonable suspicion requires "at least a minimal level of objective justification for making the stop." *Id.* (internal quotation marks omitted). "A hunch, without additional objectively articulable facts, cannot provide the basis for an investigatory stop." *Harris*, 590 N.W.2d at 101; *see also Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *Timberlake*, 744 N.W.2d at 393.

The district court ruled that Detective Jensen had reasonable and articulable suspicion that Diede was engaged in criminal activity based on six facts:

(1) "Hanson, a passenger in Defendant's vehicle, was being taken into custody on [probable cause for previous sales of] controlled substances";

(2) Detective Jensen, before Hanson got out of the truck, saw Hanson looking at him and "moving [Hanson's] right hand as if he was reaching in his pocket for something";

(3) as Hanson got out of the truck, Detective Jensen "observed what he believed to be Hanson tossing something back into the vehicle";

(4) Diede remained in the vehicle;

(5) Diede "denied that Hanson had thrown anything back into the vehicle"; and

(6) Diede appeared to be "nervous" and "fidgety" as she was questioned.

The court of appeals affirmed. It held that the first four facts were sufficient to find that Detective Jensen had reasonable articulable suspicion that Diede was engaged in the criminal activity of possessing a controlled substance.[3] *See Diede*, 2010 WL 1541335, at *2–3. The court of appeals also held that Diede's post-seizure behavior created a sufficient factual basis to expand the scope of the seizure to an investigation of her cigarette package. *Id.* at *3.

 We review the district court's findings of fact for clear error. *State v. Lemieux*, 726 N.W.2d 783, 787 (Minn. 2007). The de novo review standard controls our review of the district court's determination that its factual findings support a reasonable suspicion of criminal activity justifying the police officer's search or seizure. *See id.* Because the parties to this case stipulated to the record, we review de novo the issue of whether the stipulated facts support a determination that the police articulated a reasonable suspicion of criminal activity warranting the governmental intrusions in question. *See State v. Burbach*, 706 N.W.2d 484, 487 (Minn.2005).

We conclude that the district court erred when it determined that the six facts identified above provided Detective Jensen with reasonable articulable suspicion that Diede was engaged in drug-related criminal activity at the time she was seized. As a preliminary matter, we note that only the first four facts on which the district court relied are appropriate for consideration when determining whether Detective Jensen had an objective basis for seizing

---

**3.** Diede argued before the court of appeals that the district court had erred in including the last two facts in its analysis because they occurred after Diede was seized. Because the court of appeals found the first four facts to be sufficient to support a reasonable suspicion that Diede was engaged in criminal activity, it did not address Diede's argument.

Diede, because the other two facts did not yet exist when Diede was seized.

The remaining four facts on which the district court relied do not provide an objective basis for suspecting that Diede was engaged in the criminal activity of possessing a controlled substance. The only basis in the record for suspecting that *anyone* possessed drugs was Detective Jensen's assertion that he had probable cause to arrest Hanson for previous drug sales. But the record does not describe the foundation of that probable cause. Nor does it indicate any objectively articulable facts that would have allowed the police to reasonably infer that Hanson was carrying drugs at the time of his arrest on April 22. The record also does not indicate whether Hanson recognized Detective Jensen as a law enforcement officer, which would be necessary to support the officer's suspicion that Hanson left something in the truck in response to the presence of the police. The record does not indicate that any of the officers saw Diede reach for anything while she was in the truck or that the officers looked into the truck to see if the object they saw Hanson leave there had been removed from the truck.

■ Mere proximity to, or association with, a person who may have previously engaged in criminal activity is not enough to support reasonable suspicion of possession of a controlled substance.[4] The State concedes this, but cites *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), and *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), for the propositions that drug dealers do not usually include innocent persons in their activity and that a passenger is often engaged in a common enterprise with the driver. These cases are distinguishable. In both *Houghton* and *Pringle*, the police had already discovered drugs or drug paraphernalia inside the car.[5] The issue in *Pringle* was whether the presence of drugs in a car created probable cause to believe that any particular passenger possessed them. 540 U.S. at 370, 124 S.Ct. 795. In *Houghton*, it was "uncontested ... that the police

---

**4.** *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding that the frisk of the defendant, conducted when the police executed a search warrant for a bar where he was present, was unconstitutional because the police did not have a reasonable belief that he was armed and dangerous, and stating that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"); *Brown v. Texas*, 443 U.S. 47, 48–52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (holding that police officers who saw the defendant and another man walking away from each another in an alley in a "high drug problem area" did not have reasonable suspicion to stop and question the defendant); *Sibron v. New York*, 392 U.S. 40, 63–65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (holding that a police officer who saw the defendant talking with several known drug addicts had no "constitutionally adequate, reasonable grounds" to seize the defendant and search him for nar-

cotics); *State v. Carter*, 697 N.W.2d 199, 203, 212 (Minn.2005) (holding that police had not articulated a reasonable suspicion that drugs were in a storage unit rented by a defendant who had two previous drug convictions and who made frequent visits to the storage unit).

**5.** In *Pringle*, the police found cocaine in a car with three occupants but had no information about which of the occupants owned the cocaine. 540 U.S. at 368–69, 124 S.Ct. 795. In *Houghton*, a police officer who had stopped a car containing three passengers noticed a syringe in the driver's shirt pocket. 526 U.S. at 298, 119 S.Ct. 1297. When the driver admitted ("with refreshing candor") that he used the syringe to take drugs, the police searched the car and found methamphetamine in a passenger's purse that was on the back seat. *Id.* The Supreme Court held that the evidence was the result of a lawful search of a container as part of a vehicle search. *Id.* at 302, 119 S.Ct. 1297.

officers had probable cause to believe there were illegal drugs in the car." 526 U.S. at 300, 119 S.Ct. 1297. Neither case supports the contention that the police may reasonably suspect a person of possessing a controlled substance merely because she is in the same truck as a suspected drug dealer who appears to leave something in the truck as he is getting out of it. *Cf. United States v. Di Re*, 332 U.S. 581, 586–87, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (holding that probable cause to search a vehicle does not justify searching a passenger).

We therefore conclude that the six facts identified by the district court did not justify seizing Diede to investigate whether she was engaged in drug-related criminal activity.

■ The State argues, in the alternative, that the seizure was justified by a need to investigate the truck's mismatched license plates. Using license plates on any vehicle other than the one to which it is registered is a misdemeanor that could be a sufficient basis for a traffic stop. Minn. Stat. § 168.36, subd. 2 (2010); *see, e.g., State v. Barber*, 308 Minn. 204, 205–06, 241 N.W.2d 476, 476–77 (1976). We therefore consider whether Detective Jensen's actions during the temporary investigatory seizure were reasonably related to and justified by the circumstances that gave rise to the lawful license-plate investigation. The parties agree that during the investigatory seizure Detective Jensen asked Diede if he could look inside her cigarette package.

■ The scope of a *Terry* investigation must be limited "to that which occasioned the stop, to the limited search for weapons, and to the investigation of only those additional offenses for which the officer develops a reasonable, articulable suspicion within the time necessary to resolve the originally-suspected offense." *State v.*

*Wiegand,* 645 N.W.2d 125, 136 (Minn. 2002). Each intrusion during a stop must be "strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry,* 392 U.S. at 19, 88 S.Ct. 1868 (internal quotation marks omitted). A stop may be expanded beyond the circumstances that initially justified it only if the expansion is supported by "independent probable cause or reasonableness to justify that particular intrusion." *Askerooth,* 681 N.W.2d at 364.

In *State v. Fort*, we explained that an investigation into the presence of narcotics had no connection to the purpose for the traffic stop. 660 N.W.2d 415, 419 (Minn. 2003). In the absence of an articulable suspicion of additional criminal activity, we held that the investigative questioning, the consent inquiry, and the subsequent search were unlawful because they went beyond the scope of the initial temporary investigative seizure. *Id.*

The State argues that Detective Jensen's request to search the cigarette package fell within the scope of the license-plate investigation because the mismatched plates indicated that the truck might be stolen or that the owner might be attempting to evade automobile registration fees. We disagree. Even if mismatched plates supported a reasonable suspicion that the truck was stolen or that the owner was attempting to evade automobile registration fees, a search for drugs was not reasonably related to those justifications.

■ Nor was Detective Jensen's request supported by "independent probable cause or reasonableness to justify that particular intrusion." *Askerooth,* 681 N.W.2d at 364. Diede's nervousness in response to questioning by multiple police officers after her passenger had been arrested and her denial that she had seen Hanson toss

something into the truck were not enough to establish reasonable suspicion that she possessed a controlled substance. Furthermore, the record does not indicate that Diede interacted with anything thrown into the truck—if, in fact, something was thrown into the truck.

Because Detective Jensen did not have a reasonable articulable suspicion that Diede was engaged in drug-related criminal activity, his request to search Diede's cigarette package exceeded the scope of the initial temporary investigative seizure. Consequently, the district court erred when it denied Diede's motion to suppress the methamphetamine evidence discovered in the cigarette package.

## II.

■ Even if Detective Jensen's request to search the cigarette package was justified by reasonable suspicion that Diede was engaged in drug-related criminal activity, the methamphetamine would still have to be suppressed because the record does not support the State's claim that Jensen's warrantless search of the cigarette package was justified under the consent exception to the warrant requirement.

■ Under the Fourth Amendment to the United States Constitution and Article I, § 10 of the Minnesota Constitution, "[w]arrantless searches are presumptively unreasonable unless one of 'a few specifically established and well-delineated exceptions' applies." *State v. Licari*, 659 N.W.2d 243, 250 (Minn.2003) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The "reasonable articulable suspicion" that justifies a seizure does not permit a general search. *See Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("Nothing in *Terry* can be understood to allow ... any search whatever for anything but weapons.").

■ Consent is an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Hanley*, 363 N.W.2d 735, 738 (Minn.1985). For a search to fall under the consent exception, the State must show by a preponderance of the evidence that consent was given freely and voluntarily. *Bustamonte*, 412 U.S. at 222, 93 S.Ct. 2041; *State v. Harris*, 590 N.W.2d 90, 102 (Minn.1999). "Whether consent was voluntary is determined by examining 'the totality of the circumstances, including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said.'" *Harris*, 590 N.W.2d at 102 (quoting *State v. Dezso*, 512 N.W.2d 877, 880 (Minn.1994)). Consent is not involuntary merely because "the circumstances of the encounter are uncomfortable for the person being questioned." *Dezso*, 512 N.W.2d at 880. But "when an encounter becomes coercive, when the right to say no to a search is compromised by a show of official authority ... the Fourth Amendment intervenes." *Id.* "Failure to object is not the same as consent." *Id.* Nor is mere "acquiescence to a claim of lawful authority" enough to establish consent. *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact...." *Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041. Therefore, the "clearly erroneous" standard controls our review of a district court's finding of voluntary consent. *State v. Hummel*, 483 N.W.2d 68, 73 (Minn.1992); *State v. Alayon*, 459 N.W.2d 325, 330 (Minn.1990). Findings of fact are clearly erroneous if, on the entire evidence, we are left with the definite and firm

conviction that a mistake occurred. *State v. Andersen*, 784 N.W.2d 320, 334 (Minn. 2010).

We held in *State v. Dezso* that consent was not given voluntarily when a defendant had taken an action implying consent after repeated questioning by a police officer. In *Dezso*, a police officer stopped the defendant for speeding. 512 N.W.2d at 878–79. As part of the officer's standard procedure, he asked the defendant to sit with him in his squad car while the officer checked the defendant's license. The defendant's license checked out as valid with no record of Minnesota violations, and the officer told the defendant that he was only going to give the defendant a warning. As the officer returned the driver's license to the defendant, the officer noticed that the defendant seemed to "tilt his wallet away from the officer's view." Thinking that the defendant was trying to hide something, the officer asked the defendant to produce other items with his name on it. As the defendant removed various cards from his wallet to show to the officer, the officer leaned toward the defendant to try to look at the defendant's wallet. The following conversation ensued, as recorded by an in-car microphone:

> Officer: "Mind if I take a look at your wallet?"
>
> Defendant: "No, it's just my stuff."
>
> Officer: "Can I take a look at the wallet?"
>
> Defendant: "Yeah, I got, ah [unintelligible] cards."
>
> Officer: "What do you got in your hand there?"
>
> Defendant: "Oh, a piece of paper."
>
> Officer: "Mind if I take a look at it?"
>
> Defendant: "Well, it's mine * * * not doing anything."

*Id.* (alterations in original). At some point during that conversation, the defendant handed his wallet to the officer. The officer discovered LSD in the wallet. *Id.*

We held that the defendant had not given his wallet to the officer voluntarily. *Id.* at 881. We began by noting that "the fact that the wallet was handed over without a verbal protest [did] not, by itself, establish that the delivery was voluntary" because mere acquiescence to a show of force is not enough to establish consent. *Id.* at 880. We then examined the totality of the circumstances. Those circumstances included the facts that the defendant was sitting in a police car at the time he supposedly gave consent; that the officer's questioning, although "respectful and matter-of-fact," was official and persistent; that the officer leaned toward the defendant; and that the defendant's answers seemed "not so much to indicate willingness to allow the search as an effort, under intimidating circumstances, to fend off a search." *Id.* at 880–81. We held that under the circumstances and given the ambiguity in the record, it was "not all that clear that defendant was voluntarily consenting to a search of his wallet." *Id.* at 881.

We find that the circumstances in this case were as coercive as those in *Dezso*. At the time Diede opened her cigarette package, she had been seized, was subject to a show of police force, had received repeated requests to open the package, and had already refused consent to search the package. We discuss each of these factors below.

First, Diede had been seized at the time she purportedly consented to the search. Although a person who has been seized may still voluntarily consent, we infer consent less readily after a seizure because "once arrested, a person becomes more susceptible to police duress and coercion. Consent must be the product of more than mere submission to legal au-

thority." *State v. High,* 287 Minn. 24, 27, 176 N.W.2d 637, 639 (1970). The court in *High* was discussing an arrest, but the reasoning applies equally to seizures short of arrest.

■ Second, Diede opened her cigarette package in response to a show of force. "Mere acquiescence on a claim of police authority or submission in the face of a show of force is, of course, not enough" to establish voluntary consent. *State v. Howard,* 373 N.W.2d 596, 599 (Minn.1985). In *State v. George,* 557 N.W.2d 575, 581 (Minn.1997), we held that questioning by two officers contributed to "intimidating circumstances." Here, Diede was questioned by two officers while two additional law enforcement officers and a police dog were on the scene. Her passenger had been arrested, handcuffed, and placed in a police car. This show of force was at least as strong as that in *George.*

Third, Diede only opened her cigarette package after the officer asked her multiple times to do so. We have found consent to be involuntary when given in response to persistent questioning. *See Dezso,* 512 N.W.2d at 881; *George,* 557 N.W.2d at 581. In *Dezso,* we held that the defendant's answers were an effort "to fend off a search with equivocal responses." 512 N.W.2d at 881. Here, the police response to Diede's unequivocal refusal to consent to a search was to continue asking whether they could search. This is exactly the sort of persistent questioning we found inappropriate in *Dezso* and *George.*

■ Finally, Diede had explicitly and unequivocally refused consent to the search. Consent may be implied by action rather than words. *State v. Othoudt,* 482 N.W.2d 218, 222 (Minn.1992). The State points to the fact that Diede opened the cigarette package herself as implying consent to a search. That Diede did so does not, by itself, establish that she voluntarily consented to a search. If the action taken by the defendant in *Dezso* "without a verbal protest" was not sufficient, standing alone, to show voluntary consent, neither is the action Diede took after protesting. *See Dezso,* 512 N.W.2d at 880. Furthermore, Diede's actions implying consent occurred shortly after she had explicitly refused to consent to the search. An explicit refusal to being searched becomes part of the totality of the circumstances we evaluate in determining whether consent was voluntary. *See, e.g., id.* at 879–81.

Based on the entire record, we are left with the definite and firm conviction that the district court erred in finding that Diede voluntarily consented to the search of the cigarette package. When Diede opened her cigarette package, she did so in response to persistent questioning under coercive circumstances, after having been seized, while in the presence of four police officers and a police dog, and having already refused consent to a search of her cigarette package. We hold that the district court erred by finding that Diede had voluntarily consented to a search of her cigarette package.

### III.

■ Finally, we address the State's argument that even if Diede did not voluntarily consent to the search of her cigarette package, the police would inevitably have discovered the evidence as the result of a search incident to arresting her.[6] The

6. Although the State did not argue inevitable discovery at the court of appeals, the argument is now properly before this court. Minn. R.Crim. P. 29.04, subd. 6, allows the court to "permit a party, without filing a cross-petition, to defend a decision or judgment on any ground that the law and record permit that would not expand the relief that

State points to Diede's nervousness, her refusal to let the officers search her cigarette package, her denial that she saw Hanson leave anything in the truck, and the mismatched plates as facts supporting probable cause for arrest.

 "When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Ortega,* 770 N.W.2d 145, 149 (Minn.2009) (internal quotation marks omitted).

 "If the state can establish by a preponderance of the evidence that the fruits of a challenged search 'ultimately or inevitably would have been discovered by lawful means,' then the seized evidence is admissible even if the search violated the warrant requirement." *State v. Licari,* 659 N.W.2d 243, 254 (Minn.2003) (quoting *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The inevitable discovery doctrine is closely related to the "independent source" doctrine, which "will countenance introduction of otherwise illegally-seized evidence if the police could have retrieved it on the basis of information obtained independent of their illegal activity." *State v. Richards,* 552 N.W.2d 197, 203 n. 2 (Minn.1996) (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The State may not show inevitable discovery by claiming that if it had not searched illegally, it would have done so legally. *See State v. Hatton,* 389 N.W.2d 229, 234 (Minn.App.1986) ("If police . . . are only required to show that lawful means could have been available even though not pur-

sued, the narrow 'inevitable discovery' exception would 'swallow' the entire Fourth Amendment protection."), *rev. denied* (Minn. Aug. 13, 1986).

The facts of this case do not show that the police would inevitably have discovered the methamphetamine. The essence of the State's argument is that if the police had not illegally searched Diede's cigarette package, they could have arrested her and found the contents of the package. This is the sort of argument *Hatton* rejected. The State showed no reason, outside its questioning of Diede, why it would inevitably have discovered the methamphetamine.

 Furthermore, the State relies on improper factors to support its claim that it would have had probable cause to arrest Diede. It argues that Diede's refusal to allow a search of her cigarette package showed that she may have had something to hide. But refusal of consent cannot be considered in establishing probable cause for a search. *Cf. State v. Jones,* 678 N.W.2d 1, 12 n. 3 (Minn.2004). The State also cites Diede's nervousness under police questioning, but nervousness alone is not sufficient to establish probable cause. *See State v. Lothenbach,* 296 N.W.2d 854, 858 (Minn.1980), *superseded by rule on other grounds,* Minn. R.Crim. P. 26.01, subd. 4.

The State also asks us to find that it would have inevitably discovered the methamphetamine because the police would have had probable cause to arrest Diede based on the mismatched license places. The State admits that custodial arrests for misdemeanor violations are allowed only in certain circumstances that are not present

has been granted to the party." We have interpreted this rule to mean that a respondent may raise new arguments on appeal if "there are sufficient facts in the record for the appellate court to consider the alternative the-

ories, there is legal support for the arguments, and the alternative grounds would not expand the relief previously granted." *State v. Grunig,* 660 N.W.2d 134, 137 (Minn.2003).

in this case, *see* Minn. R.Crim. P. 6.01, subd. 1(a), but the State claims that the mismatched plates supported probable cause to arrest Diede on suspicion of driving a stolen vehicle or avoiding vehicle registration fees. The record does not support this assertion.

We hold that the State did not meet its burden of showing that the methamphetamine would inevitably have been discovered through some means untainted by the improper search and seizure.

Reversed.

Dissenting, DIETZEN, J., GILDEA, C.J., and STRAS, J.

## DISSENT

DIETZEN, Justice (dissenting).

When police approached Diede's stopped truck, it is undisputed that they had probable cause to arrest the passenger, Hanson, for the sale of illegal drugs. At the time Hanson left the truck, the police observed unusual conduct that they believed might have been a drug-related exchange from Hanson to Diede. Based upon the totality of the circumstances and the reasonable inferences from those facts, the officers had a reasonable articulable suspicion that Diede may have been involved in criminal activity that warranted further investigation. Subsequently, the police officers questioned Diede, and the district court found that she voluntarily consented to the search of her cigarette package, which resulted in the discovery of illegal drugs. The district court's findings are not clearly erroneous.

In my view, the majority applies a standard that resembles probable cause, rather than the reasonable articulable suspicion standard. Also, it fails to consider the totality of the circumstances at the time of the seizure and the reasonable inferences

from those facts from the perspective of a reasonable police officer. Further, the majority disregards the findings of the district court that Diede voluntarily consented to the search. Accordingly, I respectfully dissent.

### I.

I first address whether the police officers had a reasonable articulable suspicion that Diede was involved in drug-related criminal activity at the time she was seized. When applying the reasonable articulable suspicion standard, we must examine the totality of the circumstances at the time of the seizure. *State v. Martinson*, 581 N.W.2d 846, 852 (Minn.1998). Generally, a police officer may "stop and temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity." *State v. Cripps*, 533 N.W.2d 388, 391 (Minn.1995). Reasonable articulable suspicion must be based on "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Davis*, 732 N.W.2d 173, 182 (Minn.2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, "the officer must be able to point to something that objectively supports the suspicion at issue." *Id.* (internal quotation marks omitted). The court, however, should not consider the individual facts in isolation. Rather, the court should examine the totality of the circumstances at the time of the seizure and the reasonable inferences from those facts from the perspective of a reasonable police officer. *See Martinson*, 581 N.W.2d at 852.

The standard is met when an officer "observes unusual conduct that leads the officer to reasonably conclude in light of his or her experience that criminal activity

may be afoot." *In re Welfare of G.M.,* 560 N.W.2d 687, 691 (Minn.1997). Significantly, the reasonable articulable suspicion standard is "not high," and is less demanding than either the probable cause or preponderance of the evidence standards. *State v. Timberlake,* 744 N.W.2d 390, 393 (Minn.2008) (internal quotation marks omitted). Previous decisions of this court demonstrate that the standard is a low one. *See, e.g., Timberlake,* 744 N.W.2d at 397 (concluding that the police had reasonable articulable suspicion that the defendant was engaged in criminal activity based on a reliable informant's report that the defendant was carrying a gun in a motor vehicle); *State v. Flowers,* 734 N.W.2d 239, 252 (Minn.2007) (concluding that the defendant's "suspicious movements" in the vehicle, which occurred after police officers directed him to stop his vehicle, gave the officers a reasonable articulable suspicion that he may have been involved in some type of criminal activity (internal quotation marks omitted)); *Cripps,* 533 N.W.2d at 392 ("An officer can justify an investigative seizure of a person who is in a bar if that person appears to the officer to be under the legal age to consume alcohol.").

Diede's motion to suppress was submitted to the court upon the reports of Agent Haberer of the West Central Minnesota Drug Task Force and Detective Jensen of the Otter Tail County Sheriff's Office. We give the reports "the same force and effect as though the witnesses had testified in open court." *Leskinen v. Pucelj,* 262

Minn. 461, 463, 115 N.W.2d 346, 349 (1962). The district court concluded that six facts contained in the reports supported its determination that the reasonable articulable suspicion standard had been satisfied. The majority analyzes four of these facts to determine whether the initial seizure was justified.[1]

I disagree with the approach of the majority in its evaluation of these four facts. Specifically, the majority examines each of these facts in isolation and concludes that the facts do not meet the reasonable articulable suspicion standard. But our case law requires that we examine the totality of the circumstances at the time of the seizure, and the rational inferences from those facts, from the perspective of a reasonable police officer. Additionally, when Diede was seized, she was driving a gray Chevrolet with mismatched license plates. This fact was in existence at the time of the seizure, and therefore should be considered in evaluating the totality of the circumstances at the time of Diede's seizure.[2]

The totality of circumstances at the time of the seizure are: (1) Diede was driving a truck with mismatched license plates; (2) her passenger, Hanson, was subject to arrest on probable cause for previous sales of narcotics; (3) when Hanson exited Diede's truck, Detective Jensen observed Hanson reach into his pocket and toss something back into the truck; and (4) Diede remained in the truck. Based on this observed conduct and his experience

---

1. The majority concludes that the fifth and sixth facts relied upon by the district court were not in existence at the time of the seizure, and therefore cannot be used to justify the initial seizure. I agree.

2. I acknowledge that this fact was not mentioned in the district court's order. Our case law provides that undisputed facts may be considered by a reviewing court because rea-

sonable suspicion is an objective test, and therefore it may be included in the totality of the circumstances analyzed here. *State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992) (stating that when the facts are not in dispute, "the reviewing court may independently review the facts and determine, as a matter of law, whether the evidence need be suppressed").

as a police detective, Detective Jensen could reasonably infer: (5) Hanson was trying to hide an exchange of contraband with Diede; and (6) Diede may have been involved in drug-related criminal activity that warranted further investigation.

When these facts and rational inferences are considered in combination, the reasonable articulable suspicion standard is satisfied. Mismatched plates are a sufficient reason for a traffic stop. *See, e.g., State v. Barber*, 308 Minn. 204, 205–06, 241 N.W.2d 476–77 (1976). Moreover, "[e]vidence of tampering or unauthorized replacement of license plates, or other indications that the vehicle's occupants are attempting to conceal their identity, or the ownership of the vehicle, can be suggestive of ongoing criminal activity." *State v. Britton*, 604 N.W.2d 84, 89 (Minn.2000). Additionally, Diede's passenger was a known drug dealer who was being arrested for prior narcotics sales. The majority correctly points out that merely associating with a person involved in criminal activity is not, by itself, enough to support a seizure. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). But associating with such a person may be added to other facts to support a lawful seizure. *See id.* ("[A] person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person." (emphasis added)). Diede's proximity to Hanson when Hanson threw something back into the front of the truck where Diede was sitting supports the reasonable inference that an exchange may have occurred.

While these facts may not be sufficient to support probable cause, that is not the question here. Rather, the applicable standard is reasonable suspicion, which is less exacting and requires only that the police officer have a suspicion of criminal activity that is reasonable and articulable. Here, Detective Jensen suspected drug-related criminal activity, and his suspicion was both reasonable and articulable. Specifically, combining the fact that Diede's truck had mismatched license plates with the facts that Hanson was a known drug dealer and Diede was in the driver's seat when Hanson threw something into the front of her truck supports the reasonable inference that a drug-related exchange may have occurred. Consequently, Detective Jensen was justified in seizing Diede and asking her about Hanson's unusual conduct in throwing something back into the truck, and whether an exchange took place.

After the seizure, Detective Jensen approached Diede and asked her whether Hanson had thrown anything into the truck. Diede denied that she had seen Hanson throw anything into the truck. Agent Haberer's report states that when Diede responded to Detective Jensen's questions she was "very nervous," "fidgety," and "her voice was quivering." Based upon these additional facts, Detective Jensen could have reasonably concluded that Diede was lying when she denied seeing Hanson throw anything into the truck. While nervousness alone may not be sufficient to provide a reasonable suspicion of criminal activity, it may be added to the totality of other circumstances to support a conclusion that drug-related criminal activity is afoot. *See Martinson*, 581 N.W.2d at 852 (including nervousness during a conversation with police officers as part of the totality of the circumstances providing a reasonable articulable suspicion of drug-related criminal activity). These additional objective facts—Diede's denial of seeing something that the officer observed, and her nervous demeanor—support the continuation of the officer's investigation. *See State v. Moffatt*, 450 N.W.2d 116, 119 (Minn.1990) (stating that *United States v.*

*Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), "makes it clear that as long as the reasonable suspicion for the detention remains, the police may continue the detention provided they act diligently and reasonably.")

Subsequently, Detective Jensen asked Diede what she had in her pockets and she produced a cigarette package and a lighter. Relying on his "experience and training," Detective Jensen had a reasonable suspicion that drugs may have been in the cigarette package, and was justified in requesting that Diede open the cigarette package. Accordingly, I would conclude that throughout the stop, Detective Jensen had a reasonable articulable suspicion to support his investigation into whether illegal drug-related activity was afoot.

## II.

I next address whether Diede voluntarily consented to the search of her cigarette package when she flipped open the package in front of the police officers. Generally, a search requires a validly issued warrant; however, certain exceptions to the Fourth Amendment warrant requirement have been recognized. One of those exceptions is voluntary consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A finding of voluntary consent is a factual determination reached by reviewing "the totality of the circumstances, including the nature of the encounter, the kind of per-

son the defendant is, and what was said and how it was said." *State v. Dezso,* 512 N.W.2d 877 (Minn.1994). Various other factors must be considered, including: (1) the time of day at which consent was supposedly obtained, (2) whether the defendant was subject to persistent police questioning, and (3) whether the defendant's answers were equivocal. *State v. Harris,* 590 N.W.2d 90, 103 (Minn.1999); *see also Dezso,* 512 N.W.2d at 880–81 (concluding that consent was involuntary when a defendant was placed in a police car and subject to an ongoing series of requests to examine his wallet). We have also looked at the manner of questioning by the officers, evaluating whether the officers acted in a "threatening way or ... in any way other than professionally." *State v. Smallwood,* 594 N.W.2d 144, 155 (Minn.1999). Finally, consent may be implied from conduct, *State v. Othoudt,* 482 N.W.2d 218, 222 (Minn.1992), but failure to object is not the same as consent, *Dezso,* 512 N.W.2d at 880.

Consent is a question of fact, and therefore we will defer to the findings of the district court on the voluntariness of the consent, unless those findings are clearly erroneous. *Bustamonte,* 412 U.S. at 227, 93 S.Ct. 2041; *State v. Hummel,* 483 N.W.2d 68, 73 (Minn.1992); *see also State v. McDonough,* 631 N.W.2d 373, 390 (Minn.2001) ("We will not disturb the district court's findings unless they are clearly erroneous.").[3] The district court's find-

---

**3.** Both parties claim different standards of review apply to a district court's findings of consent. *Compare State v. Smallwood,* 594 N.W.2d 144, 155 (Minn.1999) ("A suspect's voluntary consent to a search is a question subject to 'careful appellate review.' *State v. George,* 557 N.W.2d 575, 58[0] (Minn. 1997)."), *with State v. Hummel,* 483 N.W.2d 68, 73 (Minn.1992) ("[T]he trial court's determination of consent will not be overturned unless it is clearly erroneous."). There is no

indication that, in practice, "careful appellate review" is any different from review under the clearly erroneous standard. Both require us to carefully review the record and determine whether the district court clearly erred in its factual finding of voluntary consent. Thus, for consistency with our general standard of review for factual findings, I agree with the majority that the appropriate standard of review for a district court's finding of

ings are clearly erroneous only if, after reviewing the evidence, we are left with the definite and firm conviction that a mistake occurred. *State v. Andersen,* 784 N.W.2d 320, 334 (Minn.2010).

The majority rejects the findings of the district court, and concludes the police officers used "persistent questioning under coercive circumstances" to obtain Diede's consent to the search. Because I conclude that the district court's findings are not clearly erroneous, I disagree.

Detective Jensen stated that he initially asked Diede if he could look inside the cigarette package, and she responded that he "did not have any right to do so." Agent Haberer then joined the two of them and asked Diede if she had anything else on her person, and Diede then "flipped the top of [the cigarette package] open." Agent Haberer stated, however, that after Detective Jensen asked Diede to open the package, Diede "quickly lifted the cover open." The district court found that Diede "voluntarily consented to the search of the cigarette pack by removing it from her pocket and flipping the top of the cigarette pack open." The court reviewed the discrepancy between Detective Jensen and Agent Haberer's statements over whether Diede opened the package in response to a direct question from Detective Jensen or of her own volition, but found that under either scenario "[Diede] voluntarily consented to the search." Additionally, the court found "[n]o evidence was introduced to demonstrate that the officers coerced [Diede] into [opening her cigarette package] or that [Diede's] will was otherwise overborne."

The record supports the finding of the district court that Diede's consent was voluntary. While Diede initially refused to consent to the search, we have never held

that a defendant cannot change her mind and later consent to a search. *See, e.g., Dezso,* 512 N.W.2d at 880 (stating that an evaluation of the voluntariness of consent depends on the totality of the circumstances). Rather, consent is analyzed based on the totality of the circumstances, which includes consideration of any subsequent actions supporting a finding of consent.

In my view, the majority goes too far, and simply substitutes its own judgment for that of the district court. Simply stated, a finding is not clearly erroneous because an appellate court might have resolved the question differently. *Stiff v. Associated Sewing Supply Co.,* 436 N.W.2d 777, 779 (Minn.1989) ("An appellate court exceeds its proper scope of review when it bases its conclusions on its own interpretation of the evidence and, in effect tries the issues anew and substitutes its own findings for those of the trial judge."); *see also Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 102 (Minn. 1999) ("An appellate court may not reverse a trial court due to mere disagreement with its findings."); *Gjovik v. Strope,* 401 N.W.2d 664, 668 (Minn.1987) (stating an appellate court "should not substitute its findings for that of the trial court merely because it feels that the case was wrongly decided"). Rather, pursuant to the clearly erroneous standard, a finding by the district court will stand unless it "is not reasonably supported by the evidence as a whole." *EOP–Nicollet Mall, L.L.C. v. County of Hennepin,* 723 N.W.2d 270, 284 (Minn.2006) (internal quotation marks omitted).

Both police officers stated that Diede voluntarily opened the cigarette package. There is no evidence that the first request made by Detective Jensen, or the later

voluntary consent is the clearly erroneous standard.

request by Agent Haberer, was persistent and coercive. Rather, the district court found that the questioning was professional and that Diede's will was not overborne. These findings are not clearly erroneous. Consequently, I would affirm the decision of the court of appeals.

GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Dietzen.

STRAS, J. (dissenting).

I join in the dissent of Justice Dietzen.