*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1432**

State of Minnesota,
Appellant,

vs.

Jose Martin Lugo, Jr.,
Respondent.

**Filed February 29, 2016
Reversed and remanded
Cleary, Chief Judge**

Nobles County District Court
File No. 53-CR-15-141

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Kathleen A. Kusz, Nobles County Attorney, Joel B. Whitlock, Assistant County Attorney, Worthington, Minnesota (for appellant)

Melvin R. Welch, Welch Law Firm, LLC, St. Paul, Minnesota (for respondent)

Considered and decided by Cleary, Chief Judge; Chutich, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CLEARY**, Chief Judge

In this appeal from a pretrial order, appellant State of Minnesota argues that the district court erred as a matter of law by suppressing all evidence discovered as a result of

a canine sniff and subsequent search of respondent Jose Martin Lugo, Jr.'s vehicle. The state argues that the district court erred by dismissing two charges against respondent that were based on that evidence. Because police officers articulated facts that, under the totality of the circumstances, gave rise to reasonable suspicion that respondent was engaged in drug-related criminal activity, officers lawfully conducted the canine sniff. Evidence arising from the sniff should not have been suppressed. We reverse and remand.

## FACTS

On February 23, 2015, a police officer with four years of general policing experience and six months' experience on the Buffalo Ridge Drug Task Force was conducting surveillance of a residence in Worthington, Minnesota. The task force had executed a search warrant at the residence approximately four months earlier and as a result, had seized controlled substances and arrested respondent for controlled-substance possession.

At about 8:00 a.m. on February 23, the officer observed a car parked in the driveway, with one person in the driver's seat. The officer watched the vehicle for approximately 40 minutes in total. Police dispatch had informed the officer that the vehicle's registered owner had an active felony warrant for possession of a firearm by an ineligible person and fifth-degree controlled-substance possession. The officer observed the person in the driver's seat lie across the front seat for several minutes, apparently reaching toward the passenger side. The person then exited the vehicle, walked out of the officer's sight, and returned to the vehicle approximately 12 minutes later. The person sat

2

in the driver's seat again, reached into the vehicle's back seat, and then backed out of the driveway. The officer followed the car and radioed its location to other officers, asking that the vehicle be stopped on the basis of the owner's felony warrant.

A second officer pulled behind the vehicle and turned on his emergency lights. The first officer—who had originally observed the vehicle and had followed the second officer when he pulled the vehicle over—testified that the vehicle first pulled into an automotive business parking lot, then turned in the opposite direction and drove 30 to 50 yards before parking in a stall in front of a restaurant. After the vehicle stopped, the driver briefly bent out of the second officer's sight and then returned to where the officer could see him. The second officer approached the vehicle and asked the driver to step out of the vehicle. The first officer approached the passenger side of the vehicle and immediately recognized the driver, the respondent in this case, based on previous contacts. The first officer knew at this time that respondent had recently been arrested for fifth-degree controlled-substance possession and that his Minnesota driver's license had been revoked. The second officer patted respondent down, found nothing, and placed him in the officer's patrol car while the officer ran respondent's information through the car's computer. The first officer informed the second officer that respondent's driver's license was revoked, and the patrol car computer confirmed this information.

While respondent sat in the patrol car, the second officer asked him who owned the vehicle. Respondent incorrectly identified the vehicle owner and changed his answer during the course of questioning. The officer continued questioning respondent, who

3

replied "man just take me to jail, please." When the officer asked if there were illegal items in the vehicle, respondent said, "not that I know of."

When the second officer removed respondent from the vehicle, the first officer was able to see into the vehicle. The first officer observed that the vehicle's center console molding had been removed and that the interior of the vehicle "had a lived in look." The officer knew that respondent had a history of arrests related to controlled substances, was not the registered owner of the vehicle, and had just left a "known drug house." Based on these factors, and on the "unusually long time [it took respondent] to stop his vehicle," the first officer asked a third officer to bring his K9 partner to conduct an exterior sniff of the vehicle. The dog alerted to the odor of a controlled substance at the driver's door and the trunk. The first officer then searched the vehicle and found a deodorant container on the back seat that contained baggies of a white crystalline substance. One of the baggies field-tested positive for methamphetamine. Burnt residue in a glass pipe found in the trunk also field-tested positive for methamphetamine. Officers arrested respondent for possession of a controlled substance.

Respondent was subsequently charged with second-degree controlled-substance crime (possession) under Minn. Stat. § 152.022, subd. 2(a)(1) (2014); driving after revocation, in violation of Minn. Stat. § 171.24, subd. 2 (2014); and possession of drug paraphernalia, in violation of Minn. Stat. § 152.092 (2014). Respondent moved to suppress the evidence found as a result of the vehicle search, arguing that police officers

unjustifiably expanded the scope of the search after the initial stop. Respondent did not challenge the legality of the initial stop.

In response, the state argued that numerous factors gave police officers reason to suspect that respondent was engaged in drug trafficking, therefore justifying an expansion of the search. The district court found the first police officer's omnibus hearing testimony entirely credible, but the court was not persuaded that police had a reasonable, articulable suspicion to expand the search. The district court granted respondent's motion to suppress and dismissed the two counts that were based on controlled-substance and drug-paraphernalia possession. The state seeks review of the district court's pretrial order suppressing evidence from the search.

## D E C I S I O N

Where the state appeals a pretrial suppression order under Minn. R. Crim. P. 28.04, it "must clearly and unequivocally show both that the [district] court's order will have a critical impact on the state's ability to prosecute the defendant successfully and that the order constituted error." *State v. Scott*, 584 N.W.2d 412, 416 (Minn. 1998) (quotations omitted). "Dismissal of a complaint satisfies the critical impact requirement." *State v. Trei*, 624 N.W.2d 595, 597 (Minn. App. 2001), *review dismissed* (Minn. June 27, 2001). In this case, the state argues that the district court's order had a critical impact on its ability to successfully prosecute respondent because the order resulted in dismissal of two of the three counts in the complaint, including the only felony count. Without the suppressed

5

methamphetamine and drug paraphernalia, the state lacks probable cause to support two of the three charges. The state has therefore met the critical impact standard.

The state must also show that the district court's order constituted clear error. "When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted). In this case, the relevant facts are undisputed on appeal. Whether a search is justified by reasonable suspicion or by probable cause is a legal determination that we review de novo. *State v. Burbach*, 706 N.W.2d 484, 487 (Minn. 2005).

The United States and Minnesota Constitutions prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. "Generally, a search conducted without a warrant issued upon probable cause is *per se* unreasonable." *Burbach*, 706 N.W.2d at 488 (quotation omitted). But police

> may temporarily detain a suspect without probable cause if (1) the stop was justified at its inception by reasonable, articulable suspicion, and (2) the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place.

*State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011) (quotations omitted). Police may expand the scope of a stop to investigate "other suspected illegal activity . . . only if the officer has reasonable, articulable suspicion of such other illegal activity." *State v. Wiegand,* 645 N.W.2d 125, 135 (Minn. 2002). Each incremental intrusion that is not

6

"closely related to the initial justification for the search or seizure" must be supported by "independent probable cause or reasonableness" to be valid. *State v. Askerooth*, 681 N.W.2d 353, 364 (Minn. 2004).

Reasonableness is evaluated under an objective, totality-of-the-circumstances test, which asks if the facts available to the officer at the time of the stop would "warrant a [person] of reasonable caution in the belief that the action taken was appropriate." *State v. Smith*, 814 N.W.2d 346, 351-52 (Minn. 2012) (quotations omitted). Appropriateness is further evaluated based on "a balancing of the government's need to search or seize and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at 352 (quotations omitted). It is the state's burden to "establish[ ] the validity of a warrantless search." *Askerooth*, 681 N.W.2d at 376.

The reasonable-suspicion standard is "not high." *Diede*, 795 N.W.2d at 843 (quotation omitted). But it "requires at least a minimal level of objective justification." *State v. Timberlake,* 744 N.W.2d 390, 393 (Minn. 2008) (quotation omitted). A police officer's "hunch, intuition, gut reaction, [or] instinctive sense" is insufficient to meet the standard. *State v. Baumann*, 759 N.W.2d 237, 240 (Minn. 2009). "Reasonable suspicion must be based on specific, articulable facts that allow the officer to be able to articulate at the omnibus hearing that he or she had a particularized and objective basis for suspecting the seized person of criminal activity." *Diede*, 795 N.W.2d at 842-43 (quotation omitted). An officer must be able to "precisely" explain the factual basis for his suspicion. *Baumann*, 759 N.W.2d at 240. Because police officers receive special training, in the course of

articulating reasonable suspicion they "may make inferences and deductions that might well elude an untrained person." *State v. Flowers*, 734 N.W.2d 239, 251-52 (Minn. 2007).

On appeal, respondent does not challenge the initial stop, the pat-search, his temporary detention in the squad car before his arrest, or questioning by police during that detention.[1]  The parties dispute whether police officers had reasonable, articulable suspicion of respondent's drug-related criminal activity to allow them to expand the scope of the initial stop to conduct a canine sniff.  In the district court, the state argued that the officers' prior knowledge and the observations they made during the initial stop provided a particularized, objective basis for their suspicion that respondent was engaged in drug trafficking.  At the omnibus hearing, the first officer testified that he "observed numerous indicators of illegal drug trafficking," including: (1) respondent was not the registered owner of the vehicle; (2) the vehicle had a "lived-in look"; (3) the vehicle's center console had been removed and the plastic pieces tampered with; (4) it took respondent an "unusual[ly] long time to stop" after police initiated the stop; and (5) respondent was leaving a "known drug house."  Additionally, the officer testified that when he approached

---

[1] In the district court, the state and respondent disputed how long police officers required respondent to wait before the K9 officer arrived, arguing that respondent was detained for between 5 and 20 minutes.  The Supreme Court recently held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015).  The district court's order did not address the duration of the stop, but focused on whether officers unlawfully expanded the scope of the stop.  Respondent does not challenge the duration of the stop on appeal.  For that reason, and because we hold that police officers' reasonable suspicion of criminal drug-related activity justified expansion of the scope of the initial stop, *Rodriguez* is inapplicable here.

the car after respondent had been pulled over, he immediately recognized respondent and knew that he had recently been arrested for controlled-substance possession. The officer testified that he also considered the fact that in June 2013, the registered owner was arrested for possession of drug paraphernalia. But the testifying officer did not explain how each of these factors formed an objective, particularized basis for his suspicion that respondent was engaged in drug trafficking. The state's memorandum in opposition to respondent's motion to dismiss did explain how some, but not all, of the factors supported reasonable suspicion.

Despite the state's failure to precisely explain each fact that formed a basis for the officers' reasonable suspicion, the state did set forth "at least a minimal level of objective justification." *Timberlake,* 744 N.W.2d at 393 (quotation omitted). The state explained that people will tamper with a vehicle's interior paneling to hide drugs behind the panels. And the state asserted that when a police officer pulls a driver over and it takes the driver a long time to stop, it gives a person in the vehicle "time to dispose or hide contraband."

We agree with the district court that the state offered several facts that were not indicative of criminal drug-related activity. And the district court was correct in observing that respondent was apparently not under the influence of drugs, nor were there visible drugs or drug paraphernalia in the car or on respondent's person. But police officers were able to "point to *something* objectively supporting [their] suspicion." *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000) (emphasis added).

Police officers initiated the stop because they had reason to believe that the driver had an active felony warrant for possession of controlled substances and possession of a firearm. Officers had suspicion of drug-related activity from the beginning. Once officers stopped respondent, they made observations that gave them reason to believe that respondent was engaged in illegal drug-related activity. The condition of the vehicle's center console, the unusually long time it took respondent to stop, the fact that respondent had just departed a house under surveillance for illegal drug-related activity, respondent's alleged drug possession close to the time of the stop, and respondent's unusual statements, when taken together, form a sufficiently particularized and objective basis for the officers' reasonable, articulable suspicion. The district court therefore erred in suppressing the evidence discovered as a result of the canine sniff and dismissing the two counts that were based on that evidence.

**Reversed and remanded.**