STATE of Minnesota, Respondent,

v.

Brandon Ryan SMITH, Appellant.

No. A10–0916.

Supreme Court of Minnesota.

June 6, 2012.

Lori Swanson, Attorney General, Saint Paul, MN; and James C. Backstrom, Dakota County Attorney, Cheri A. Townsend, Assistant County Attorney, Hastings, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant State Public Defender, Saint Paul, MN, for appellant.

OPINION

ANDERSON, PAUL H., Justice.

The State charged Brandon R. Smith with gross misdemeanor possession of a

pistol without a permit and misdemeanor illegal transportation of a firearm. The charges resulted from Smith's possession of a pistol retrieved from his car by two state troopers during an otherwise lawful traffic stop. At a contested omnibus hearing before the Dakota County District Court, Smith challenged the admission of the pistol into evidence. Smith argued that the court should exclude the pistol because the troopers expanded the scope of the traffic stop without reasonable, articulable suspicion of illegal activity, as required under Minnesota law. The court denied Smith's motion. The court subsequently found Smith guilty of both charged offenses, convicted him of both offenses, and sentenced him. Smith appealed. The court of appeals vacated the misdemeanor sentence for illegal transportation of a firearm but affirmed the gross misdemeanor sentence for possession of a pistol without a permit, concluding that the district court did not err when it admitted the pistol into evidence. *State v. Smith*, No. A10–916, 2011 WL 1236122, at *4 (Minn.App. Apr. 5, 2011). Smith appealed his gross misdemeanor conviction to our court on the same grounds. We affirm.

On the evening of July 6, 2009, Minnesota State Trooper Trainee David Ehrhardt, under the direction of State Trooper Michael J. Gensmer, "clocked" the appellant, Brandon R. Smith, driving a Chevrolet Camaro at 77 miles per hour in a 65–miles–per–hour zone. When the officers clocked Smith's speed, they were parked in a marked squad car on the Highway 52 median at 200th Street in Vermillion Township, Dakota County. When Smith drove past the officers, he was in the northbound left lane of Highway 52. As Smith drove by, the officers observed that he was not wearing his seatbelt.

The officers pulled onto Highway 52 to follow Smith. But before the officers could activate their siren or emergency lights, Smith moved into the right lane and then onto the highway's shoulder, where he came to a stop. After Smith stopped his car, the officers pulled up behind him and activated their emergency lights. At this time the officers observed that Smith's car had Illinois license plates.

After the two vehicles were stopped on the shoulder of the highway, Ehrhardt got out of the squad car and walked to the passenger side of Smith's car. At the time, Ehrhardt was wearing a microphone that recorded his conversation with Smith and played the conversation through a speaker inside the squad car, where it could be heard by Gensmer. After reaching Smith's car, Ehrhardt asked Smith if he knew why he had been stopped. Smith replied that he did not know why the officers had stopped him. Ehrhardt then explained that Smith had been speeding and he was seen not wearing a seatbelt. Ehrhardt also asked Smith for his driver's license and proof of insurance. Smith gave Ehrhardt his license, but stated that he did not have proof of insurance because he had recently switched insurance carriers and had not yet received his new insurance card. At this point, Gensmer, who was listening to the conversation while sitting in the squad car, sensed that Ehrhardt was "struggling a little bit" with the stop. As a result of this concern, Gensmer got out of the squad car and joined Ehrhardt at the passenger side of Smith's car.

Gensmer asked Smith why he had "pull[ed] over ... if [he didn't] know why [he] got stopped." Smith replied that he had pulled over to enter an address into his GPS system. Smith explained that he was travelling from Illinois to meet someone at an American Legion bar in Saint Paul, but did not know how to get to the bar. During this interaction, Gensmer no-

ticed that Smith was shaking "very violently"—"way worse than anyone with Parkinson's Disease." Gensmer asked Smith why he was "shaking so bad[ly]." Smith replied, "I always shake." Gensmer then asked whether Smith's shaking was a medical condition. Smith responded that his shaking was due to an undiagnosed medical condition that he had suffered from his entire life. Gensmer later testified at a contested omnibus hearing that he did not believe Smith was under the influence of alcohol or drugs when the stop was made, but instead assumed Smith's shaking was due to nervousness. Gensmer also testified that during this interaction he saw a box of Remington ammunition partially covered with debris on the floor in the backseat of Smith's car.

Following their initial interaction with Smith, Gensmer and Ehrhardt returned to the squad car. In the squad car, the two officers discussed Smith's nervousness and the fact that Smith was travelling from Illinois to Saint Paul. Gensmer later testified that he found Smith's behavior "evasive" and "odd." Because of that impression, Gensmer told Ehrhardt, "[H]e's probably hiding something in the car or he ha[s] some kind of criminal activity going on here, so you might want to investigate a little further." Gensmer then instructed Ehrhardt to return to Smith's car to ask for Smith's middle name so the officers could run a computer verification of Smith's driver's license. Gensmer also instructed Ehrhardt to ask Smith if he had "anything illegal in [the] car [or] any weapons in [the] car."

Ehrhardt followed Gensmer's instructions and returned to the passenger side of Smith's car. Ehrhardt asked Smith for his middle name and then asked if Smith had "anything illegal or any weapons in th[e] car." Smith responded that he had his pistol with him, and motioned toward the space near the center console next to his right hip.

During this conversation, Gensmer was listening while he remained inside the squad car. After hearing that Smith had a pistol, Gensmer again joined Ehrhardt at the passenger side of Smith's car. Gensmer spoke with Smith while Ehrhardt circled to the driver's side of the car. The officers then told Smith to get out of his car. Smith complied with the request. Once Smith was outside the car, the officers handcuffed him and asked if he had a permit to carry his pistol. Smith replied, "I did, but it got taken away...." The officers then placed Smith in the backseat of the squad car.

While Smith remained in the squad car, the officers retrieved the pistol from Smith's car and conducted a search of the car, eventually enlisting the aid of other officers and a K–9 unit. During the search, the officers removed a box of Remington ammunition from the backseat. The officers did not find any drugs or other illegal material in Smith's car. Gensmer testified during the omnibus hearing that Smith had been cooperative, that his driver's license was valid, and that the two officers made no further inquiries into Smith's proof of insurance beyond their initial request. After making arrangements to have Smith's car towed, the officers left the scene with Smith in custody in the backseat of the squad car. The officers took Smith to the Dakota County Jail, where he was booked.

Two days later, the State charged Smith by complaint with gross misdemeanor possession of a pistol without a permit, Minn. Stat. § 624.714, subd. 1a (2010), and misdemeanor illegal transportation of a firearm, Minn.Stat. § 97B.045, subd. 1 (2010). Smith subsequently brought a motion at a contested omnibus hearing challenging the admission of the pistol. Smith argued that

the officers' discovery of the pistol was the product of an unconstitutional search and seizure. The district court denied Smith's motion. The court concluded that Smith's behavior justified Ehrhardt's inquiry into whether Smith had any illegal material or weapons. The parties then submitted to a stipulated facts trial before the court. On March 23, 2010, the court found Smith guilty of both charged offenses. The court then convicted Smith of both offenses and sentenced him to probation, but stayed imposition of the sentence pending an appeal.

Smith appealed, asserting that by asking whether he had anything illegal or any weapons in the car, the officers expanded the scope of the traffic stop without reasonable suspicion of criminal activity and therefore the seizure that followed was illegal. He argued that because the search was illegal, the district court should have excluded the pistol as evidence. The court of appeals affirmed the district court on that issue. *State v. Smith*, No. A10–916, 2011 WL 1236122, at *4 (Minn.App. Apr. 5, 2011). The court of appeals concluded that Ehrhardt's "single question posed to [Smith] did not expand the scope of the stop." *Id.* Based on that conclusion, the court of appeals held that the district court did not err by admitting the pistol into evidence. *Id.* The court of appeals also vacated the sentence for illegal transportation of a firearm because that conviction arose from the same behavioral incident as the possession of a pistol without a permit conviction. *Id.* Smith subsequently appealed to our court, arguing that the district court erred when it admitted the pistol into evidence because the pistol was discovered as a result of an unreasonable seizure.

■ The Minnesota Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers,

and effects against unreasonable searches and seizures." Minn. Const. art. I, § 10. Under Minn. Const. art. I, § 10, a traffic stop does not violate the right to be free from unreasonable searches and seizures as long as "each incremental intrusion during a stop [is] 'strictly tied to and justified by the circumstances which rendered [the initiation of the stop] permissible.'" *State v. Askerooth*, 681 N.W.2d 353, 364 (Minn. 2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also State v. Wiegand*, 645 N.W.2d 125, 135 (Minn.2002).

■ To remain constitutional, an intrusion not strictly tied to the circumstances that rendered the initiation of the stop permissible must be supported by at least a reasonable suspicion of additional illegal activity. *Askerooth*, 681 N.W.2d at 364–65. In *Askerooth*, we held that a traffic stop does not violate Minn. Const. art. I, § 10, as long as each incremental intrusion during the stop "[is] tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry [v. Ohio]*." *Askerooth*, 681 N.W.2d at 365. Article I, Section 10, "imposes [this] reasonableness limitation on both the duration and the scope" of a traffic stop. *Wiegand*, 645 N.W.2d at 136. We review de novo a district court's determination of reasonable suspicion of illegal activity. *State v. Diede*, 795 N.W.2d 836, 843 (Minn.2011). But in that review, we accept the district court's factual findings unless they are clearly erroneous. *State v. Burbach*, 706 N.W.2d 484, 487 (Minn.2005). Evidence resulting from an unreasonable seizure must be excluded. *State v. Harris*, 590 N.W.2d 90, 97 (Minn.1999).

Smith asks us to reverse the district court and court of appeals, and vacate his conviction for gross misdemeanor posses-

sion of a pistol without a permit. Smith argues that while the traffic stop was initially lawful, Ehrhardt's question about having "anything illegal" or any weapons in the car exceeded the original justifications of the traffic stop—the speeding and seatbelt violations—and therefore expanded the scope of the traffic stop. Smith argues this expansion was unreasonable because we have rejected nervousness as a sufficient basis on which to form the type of reasonable suspicion necessary to justify an expansion in the scope of a traffic stop. Therefore, Smith argues that the pistol the officers found as a result of the unreasonable expansion should not have been admitted into evidence.

■ When considering whether a traffic stop violated a person's right to be free from unreasonable searches and seizures under Minn. Const. art. I, § 10, we first determine whether the officers expanded the duration or scope of the stop beyond the stop's original justification. *See, e.g., State v. Fort,* 660 N.W.2d 415, 418–19 (Minn.2003). While an expansion in either duration or scope could violate Minn. Const. art. I, § 10, our analysis often focuses on scope. *E.g., Diede,* 795 N.W.2d at 845–46; *Askerooth,* 681 N.W.2d at 364–65; *Fort,* 660 N.W.2d at 419 n. 1; *Wiegand,* 645 N.W.2d at 136–37. If we determine that the officers expanded the duration or scope of a traffic stop, we next consider whether the officers had reasonable, articulable suspicion to support that expansion. *See, e.g., Diede,* 795 N.W.2d at 842–46. If we determine the officers had reasonable, articulable suspicion to support the expansion, the traffic stop does not violate Minn. Const. art. I, § 10. *See Wiegand,* 645 N.W.2d at 135. Moreover, evidence found as a result of a reasonable

expansion may be admitted at trial. *See Harris,* 590 N.W.2d at 97.

■ Smith does not argue that the officers expanded the duration of the traffic stop; rather, he argues that Ehrhardt's question expanded the scope of the stop. Generally, we decide whether an officer's act expanded the scope of a traffic stop before specifically focusing on our constitutional analysis. *E.g., Askerooth,* 681 N.W.2d at 364–65. But here, we conclude that—under the specific facts of this case as found by the district court—we can turn to the constitutional question raised by Smith without deciding whether Ehrhardt's question expanded the scope of the stop. We can do so because we conclude that Smith's extreme shaking and his evasive response when asked about his shaking provided the officers with reasonable, articulable suspicion sufficient to support an expansion of the traffic stop. In essence, because we conclude that the officers had reasonable, articulable suspicion to support the alleged expansion of the stop, we assume without deciding that Ehrhardt's question caused an incremental expansion in the scope of the traffic stop.[1]

■ As noted earlier, a police officer may expand the scope of a traffic stop to "include investigation of other suspected illegal activity ... only if the officer has reasonable, articulable suspicion of such other illegal activity." *Wiegand,* 645 N.W.2d at 135; *see also Askerooth,* 681 N.W.2d at 364. To be reasonable, the basis of the officer's suspicion must satisfy an objective, totality-of-the-circumstances test. We have described this test as asking whether " 'the facts available to the officer at the moment of the seizure [would] warrant a man of reasonable cau-

---

1. We are not persuaded by the State's argument that a question cannot expand the scope of a traffic stop. Instead, we recognize that even a single question, depending on its content, could expand the scope of a traffic stop under other facts.

tion in the belief that the action taken was appropriate.'" *Askerooth,* 681 N.W.2d at 364 (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868). The test for appropriateness, in turn, is based on a "'balancing of the government's need to search or seize and the individual's right to personal security free from arbitrary interference by law officers.'" *Burbach,* 706 N.W.2d at 488 (quoting *Askerooth,* 681 N.W.2d at 364–65); *see also State v. Henning,* 666 N.W.2d 379, 384 (Minn.2003). While the reasonable suspicion standard is "less demanding than probable cause or a preponderance of the evidence," it still "'requires at least a minimal level of objective justification.'" *State v. Timberlake,* 744 N.W.2d 390, 393 (Minn.2008) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

▪ Reasonable suspicion "must be 'particularized'" and based on "'specific and articulable' facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Davis,* 732 N.W.2d 173, 182 (Minn.2007) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868); *Burbach,* 706 N.W.2d at 488 (quoting *Fort,* 660 N.W.2d at 418). Further, we have said that "by virtue of the special training they receive, police officers articu-

lating a reasonable suspicion may make inferences and deductions that might well elude an untrained person." *State v. Flowers,* 734 N.W.2d 239, 251–52 (Minn. 2007) (citing *Askerooth,* 681 N.W.2d at 369).

▪ The State asserts that the totality of the circumstances at the time of Smith's traffic stop include: (1) Smith's "violent shaking"; (2) Smith's "evasive" explanation that he suffers from a lifelong undiagnosed medical condition; (3) the box of ammunition in Smith's backseat; (4) Smith's lack of proof of insurance; (5) the fact that Smith was crossing state lines; and (6) the fact that Smith pulled over to the highway shoulder without being signaled to do so. As discussed in more detail below, we conclude that Smith's "violent shaking," coupled with his "evasive" response regarding the shaking, provided the officers a reasonable, articulable suspicion of other illegal activity sufficient to warrant the alleged expansion of the traffic stop in this case. Consequently, we need not and do not decide whether the box of ammunition[2] or Smith's pulling over to the highway shoulder without being signaled to do so provided additional support for the alleged expansion of the traffic stop.[3]

2. The district court did not make a factual finding regarding Gensmer's testimony that he saw the ammunition upon his first approach of Smith's car. Nevertheless, the State argues that we should consider Gensmer's sighting of the ammunition in our totality-of-the-circumstances analysis. Smith argues that Gensmer's testimony regarding the ammunition is controverted by the following facts: Gensmer did not speak to Ehrhardt about the ammunition until retrieving it from Smith's backseat, Gensmer did not act immediately upon seeing the ammunition, Gensmer did not require Ehrhardt to include Gensmer's initial sighting of the ammunition in the police report that Ehrhardt drafted, and the ammunition was partially covered with debris. In some cases, we have concluded

that a remand for further findings is necessary before we will decide the validity of a district court's order. *See, e.g., State v. Wicklund,* 295 Minn. 402, 201 N.W.2d 147 (1972). However, remand is not necessary in this case because Smith's "violent shaking" and his "evasive" response regarding the shaking provided the officers a reasonable, articulable suspicion of other illegal activity, sufficient to warrant the alleged expansion of the traffic stop in this case.

3. Here, we need not decide when, if ever, pulling over to the highway shoulder without being signaled to do so would provide additional support for an expansion of a traffic stop. But we take this opportunity to note that pulling off the highway when entering

While "[w]e have been reluctant to rely on nervous behavior as evidence to support a reasonable, articulable suspicion of criminal activity," here we do not consider Smith's nervousness, or his "violent shaking," in isolation; rather, we consider Smith's nervousness and shaking alongside his "evasive" explanation of his shaking. *Burbach,* 706 N.W.2d at 490. Further, we conclude that it was not irrational for the officers, based on their training and experience, to infer or deduce that the extent of Smith's nervousness was not "reasonable in the context" of this traffic stop. *Id.; see also Flowers,* 734 N.W.2d at 251–52 (citing *Askerooth,* 681 N.W.2d at 369).

We recognize that ordinary drivers may become nervous during a routine traffic stop. But Smith's nervousness appears to have manifested itself in a severe physical manner, distinguishing it from past cases in which we decided nervousness was an insufficient basis to establish reasonable suspicion of illegal activity. For example, in *Wiegand,* a police officer conducting a traffic stop noted that the driver-defendant "had very slow and quiet speech, was somewhat nervous, was shaking, ... had glossy eyes," and looked down when speaking to the officer. 645 N.W.2d at 128. Even though the officer did not suspect that the defendant was under the influence of drugs, the officer asked the defendant if there were narcotics in the vehicle, requested permission to search the vehicle, and ultimately walked a narcotics dog around the vehicle. *Id.* at 128–29. We concluded in *Wiegand* that the defendant's nervousness was "not an articulable basis to suspect criminal activity" because the officer did not suspect narcotics-related activity. *Id.* at 137.

In *Fort,* a police officer conducting a traffic stop noted that the passenger-defendant "was nervous and avoided eye contact." 660 N.W.2d at 417. On that basis, as well as the fact that the defendant did not have a valid driver's license, the officer asked the defendant a series of questions "about drugs and weapons." *Id.* The officer ultimately searched the defendant's body. *Id.* We concluded that the defendant's nervousness did not support reasonable, articulable suspicion, even when considered within the totality of the circumstances, because the officer never "suspected any crime other than the traffic violations." *Id.* at 419.

Likewise, in *Burbach,* a police officer conducting a traffic stop noted that the driver-defendant was "significantly more nervous, fidgety, and talkative than a normally nervous person in a traffic stop." *Burbach,* 706 N.W.2d at 486. While the officer did not suspect that the defendant was under the influence of drugs, the officer "remembered [the defendant's] name and her vehicle's license plate from a [narcotics] tip" he had received earlier. *Id.* The officer asked the defendant "if she had recently used any illegal drugs or if she had any in her car." *Id.* The officer ultimately searched the vehicle. *Id.* at 487. The district court found that the defendant's "nervousness was reasonable in the context of intense police questioning." *Id.* at 490. We agreed with the district court's finding, and therefore held that the defendant's nervousness could not support a reasonable, articulable suspicion of illegal activity. *Id.*

Here, like in *Burbach,* the district court appears to have made a factual finding about the reasonableness of Smith's nervousness within the context of the particu-

---

data into a GPS or any other electronic device is, for safety reasons, a wise procedure. We agree with District Court Judge Rex D. Sta-

cey, who acknowledged this point at the omnibus hearing when he said, "[P]ulling over on his own, I don't see that as being evasive."

lar traffic stop. While in *Burbach* the court found that the defendant's nervousness was "reasonable" in the context of the traffic stop, here the court appears to have reached the opposite conclusion based on Smith's "shaking violently," Smith's explanation of his shaking, and other factors. *Id.* at 490. In *Burbach,* as in this case, we must give deference to the court's factual findings regarding the reasonableness of the defendant's behavior in the context of a particular traffic stop. *See id.* at 487, 490. We consider those findings when making our legal conclusion of whether the defendant's behavior provided the police with a reasonable, articulable suspicion of illegal activity. *Id.* at 487.

Finally, in *Diede,* a police officer conducting a traffic stop noted that the driver-defendant "seemed nervous." 795 N.W.2d at 841. Just moments before, another officer had arrested the defendant's passenger, who was suspected of narcotics-related activity. *Id.* The arresting officer then asked the defendant if she had seen the passenger throw anything into the vehicle. *Id.* The officer also asked to look inside a cigarette package the defendant was holding. *Id.* The officers ultimately arrested the defendant on the basis of a plastic baggie of methamphetamine they found inside the cigarette package. *Id.* at 841–42. We concluded that the defendant's nervousness was "in response to questioning by multiple police officers after her passenger had been arrested and her denial that she had seen [the passenger] toss something" into the vehicle, and did not support reasonable, articulable suspicion of illegal activity. *Id.* at 845–46.

Unlike the defendants in the cases discussed above, Smith exhibited behavior that went beyond mere "nervousness." Gensmer testified that Smith was shaking "very violently"—"way worse than anyone with Parkinson's Disease." To shake

"violently" is to shake with "extreme force." *Merriam–Webster's Collegiate Dictionary* 1314 (10th ed.2001). It appears that Smith's "nervousness" was much more pronounced than that exhibited by the defendants in the cases discussed above. Further, unlike *Diede* and *Burbach,* cases in which the defendant's nervousness arose due to events like "intense police questioning" and the arrest of the defendant's passenger, Smith was shaking "violently" before any intense police questioning. *Diede,* 795 N.W.2d at 845–46; *Burbach,* 706 N.W.2d at 490.

Moreover, we must consider Smith's shaking in conjunction with his response to the officer's question about his shaking. When asked why he was "shaking so bad[ly]," Smith did not simply "avoid[ ] eye contact" or look away from the officers, like the behavior the defendants in *Fort* and *Wiegand* displayed. *Fort,* 660 N.W.2d at 417; *Wiegand,* 645 N.W.2d at 128. Instead, Smith responded to the question with an answer that was at best equivocal and more likely evasive—Smith told the officers that he "always shake[s]" due to an undiagnosed medical condition. The officers interpreted this response as evading their question. Finally, we again note that at the time of the traffic stop, the officers knew that Smith had committed up to three separate traffic violations: speeding, not wearing a seatbelt, and inability to provide proof of insurance.

This case requires us to consider the totality of the circumstances and give deference to the district court's factual findings. Ultimately, we conclude that Smith's "violent shaking" and "evasive" explanation of that shaking form a sufficient basis upon which the officers developed a reasonable, articulable suspicion of other illegal activity. That suspicion was sufficient to warrant the alleged incremental expansion of the traffic stop in this case.

Accordingly, we conclude that Ehrhardt's question did not constitute an unreasonable seizure and thus the pistol found as a result of the question need not be excluded from evidence. Therefore, we hold that the district court did not err when it admitted the pistol into evidence.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. In concluding that the law enforcement officers had a reasonable, articulable suspicion of criminal activity, the court has retreated from the well-established principle that a defendant's nervousness does not provide an officer with a reasonable suspicion of criminal activity. *See, e.g., State v. Burbach,* 706 N.W.2d 484, 490 (Minn.2005) (explaining that the officer's testimony "that Burbach's nervousness was significantly more than normal nervousness during a traffic stop" did not support a reasonable suspicion of criminal activity). Because the officers expanded the scope of the traffic stop without the reasonable, articulable suspicion of criminal activity required by *State v. Fort,* 660 N.W.2d 415 (Minn.2003), I would reverse the district court's denial of appellant Brandon Smith's suppression motion.

The court's opinion describes many of the relevant facts. I therefore need only highlight the facts essential to my conclusion that the officers lacked a reasonable, articulable suspicion of criminal activity when they expanded the scope of the traffic stop by asking Smith whether he had "anything illegal or any weapons in th[e] car."

At the omnibus hearing, Minnesota State Trooper Michael J. Gensmer testified as follows. Midway through the traffic stop, which was based on a speeding violation, Gensmer directed State Trooper Trainee David Ehrhardt to ask Smith whether he had "anything illegal or any weapons in th[e] car" because Gensmer found Smith's behavior during the traffic stop to be "evasive" and "odd." The behavior in question included: (1) pulling over to the shoulder of the highway before the officers activated the squad car emergency lights; (2) travelling from Illinois to meet someone at an American Legion bar in St. Paul, without knowing how to get to the bar; (3) shaking "very violently"— "way worse than anyone with Parkinson's Disease"; and (4) explaining that his shaking was due to an undiagnosed medical condition that he had suffered from his entire life.[1] Based on Smith's above-described behavior, Gensmer told Ehrhardt, "[H]e's probably hiding something in the car or he ha[s] some kind of criminal activity going on here...." Gensmer conceded at the omnibus hearing that he did not believe Smith was under the influence of alcohol or drugs.

On appeal, Smith contends the officers lacked a reasonable, articulable suspicion of criminal activity when they expanded the scope of the traffic stop by asking Smith whether he had "anything illegal or any weapons in th[e] car." I agree.

Article I, Section 10, of the Minnesota Constitution mandates that an intrusion, which is not strictly tied to the circumstances that permitted the initial traffic stop, be supported by at least a reasonable, articulable suspicion of additional criminal activity. *State v. Askerooth,* 681 N.W.2d 353, 364–65 (Minn.2004); *State v. Wiegand,* 645 N.W.2d 125, 135 (Minn. 2002). An investigation of the presence of weapons or narcotics has no connection to the purpose of a traffic stop that is based on a cracked windshield and a speeding violation. *Fort,* 660 N.W.2d at 419. A

---

1. Before the expansion of the traffic stop, Smith told the officers that he had pulled over to the side of the highway to enter the American Legion address in his GPS.

reasonable, articulable suspicion "must be 'based on specific, articulable facts'" that allow an officer "'to articulate at the omnibus hearing that he or she had a particularized and objective basis for suspecting the seized person of criminal activity.'" *State v. Diede*, 795 N.W.2d 836, 842–43 (Minn.2011) (quoting *State v. Cripps*, 533 N.W.2d 388, 391 (Minn.1995)). A defendant's nervousness does not provide an officer with a reasonable, articulable suspicion of criminal activity, even when the nervousness is significantly more than normal nervousness during a traffic stop. *Burbach*, 706 N.W.2d at 490; *see also Diede*, 795 N.W.2d at 845–46 (explaining that "Diede's nervousness in response to questioning by multiple police officers after her passenger had been arrested and her denial that she had seen Hanson toss something into the truck were not enough to establish reasonable suspicion that she possessed a controlled substance"); *Wiegand*, 645 N.W.2d at 137 (explaining that the officer's observations of evasive and nervous conduct did not support an articulable suspicion of criminal activity when "the officer also testified that he did not conclude at the point that he determined to retrieve his dog that the driver was under the influence of anything").

Applying our well-established caselaw to the facts of Smith's case, I conclude that Smith's behavior did not provide the officers with an objective basis to suspect that Smith was engaged in criminal activity. It is not illegal for an out-of-state traveler, who suffers from a medical condition like Parkinson's Disease, to pull over to the side of the highway to input an address into his or her GPS.[2] Perhaps more importantly, the State has never articulated, nor can I conceive of, any violation of the law that could be inferred from the behavior in question.

Characterizing Smith's statement about his medical condition as "evasive" and his nervousness as "very violent," the court concludes the officers had an objective basis to suspect that Smith was engaged in criminal activity. The court's analysis is unpersuasive for two reasons. First, there was nothing evasive about Smith's explanation of his medical condition. Second, we previously held in *Burbach*, 706 N.W.2d at 490, that a significantly unusual degree of nervousness does not provide an officer with a reasonable suspicion of criminal activity.

Because the record in this case demonstrates that the officers expanded the scope of the traffic stop without a reasonable, articulable suspicion of criminal activity, I would reverse the district court's denial of Smith's suppression motion. Consequently, I respectfully dissent.

MEYER, Justice (dissenting).

I join in the dissent of Justice Page.

---

2. The court contends that it must defer to the district court's finding that Smith's nervousness was not reasonable in the context of a traffic stop. Such deference is not warranted in this case because the district court's nervousness finding is clearly erroneous. *See State v. Ortega*, 770 N.W.2d 145, 149 (Minn. 2009) (explaining that the clearly erroneous standard controls our review of district court findings). A finding is clearly erroneous when there is no reasonable evidence to support the finding or when an appellate court is left with the definite and firm conviction that a mistake occurred. *State v. Evans*, 756 N.W.2d 854, 870 (Minn.2008). The record contains no reasonable evidence to support the district court's finding that Smith was unreasonably nervous, especially when the only evidence regarding Smith's shakiness indicates that it was caused by an undiagnosed medical condition. Because the district court's nervousness finding is clearly erroneous, the court's deference to that finding is unwarranted.