*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1454**

State of Minnesota,
Respondent,

vs.

Travis Richard Otto,
Appellant.

**Filed July 18, 2016
Affirmed in part, reversed in part, and remanded
Schellhas, Judge**

Sherburne County District Court
File No. 71-CR-13-1076

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Kathleen A. Heaney, Sherburne County Attorney, Dawn R. Nyhus, Assistant County
Attorney, Elk River, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Reyes, Presiding Judge; Schellhas, Judge; and Bratvold,

Judge.

## UNPUBLISHED OPINION

**SCHELLHAS**, Judge

        Appellant challenges his convictions of first-degree controlled-substance crime and

fourth-degree driving while impaired, arguing that law enforcement detained him without

reasonable, articulable suspicion; impermissibly expanded the scope of the investigatory detention; and coerced his consent to a warrantless test of his blood. We affirm in part, reverse in part, and remand.

## FACTS

While driving near Big Lake at about eleven o'clock on a sunny, dry morning in August 2013, appellant Travis Richard Otto left Highway 10, sheared off a utility pole at its base, and downed at least one power line. The crash caused the air bags in Otto's car to deploy and caused extensive front-end damage to the car, including engine-fluid leaks.[1] But Otto was able to drive the car about a quarter-mile to a tavern parking lot. At least one witness to the crash called police.

Big Lake Police Officer Cindy Finch located Otto's car in the lot and saw Otto getting out of his car. Officer Finch spoke with Otto, who declined medical attention and told Officer Finch about the crash. A few minutes later, State Patrol Trooper Troy Morrell arrived, spoke with Officer Finch, and took over the investigation while Officer Finch remained at the scene. Trooper Morrell questioned Otto about the crash and observed his demeanor and behavior. As Otto conversed with Trooper Morrell, he moved toward his car multiple times; Trooper Morrell asked Otto two or three times to "come away" from his car and finally directed him to "come closer" to Trooper Morrell's squad car.

Trooper Morrell asked Otto, "Is there anything on you that I need to be aware of?" Otto responded that he had his cell phone on him. Trooper Morrell asked Otto whether he

_____

[1] The record is unclear regarding Otto's ownership of the car, but we refer to the car as "Otto's car."

2

had "anything else in [his] pants pockets or otherwise on [his] person that [Trooper Morrell] need[ed] to be aware of," and Trooper Morrell saw "a bulky-type object" in Otto's pants pocket and asked Otto about it. Otto answered, "Look, I have drugs." Trooper Morrell handcuffed Otto and removed the object—a zippered pouch—from Otto's pocket. Trooper Morrell opened the pouch and found what he believed to be methamphetamine; he found more suspected methamphetamine and a roll of cash in Otto's other pants pocket. Trooper Morrell then told Otto that he was under arrest, conducted a pat-down search of Otto, and put Otto in the back of Trooper Morrell's squad car. Neither Trooper Morrell nor Officer Finch gave Otto a *Miranda* warning.

While Otto sat in the squad car, Trooper Morrell and Officer Finch searched Otto's car. At one point, Otto asked Trooper Morrell to call his father to let him know that he had been arrested and stated that he would cooperate. Trooper Morrell asked him what he meant by "cooperate," and Otto said that he would tell Trooper Morrell where he was coming from and where he was headed. At a later point, Otto called out and complained that the squad car was hot and that he was sweating. Trooper Morrell turned up the air conditioning. Eventually, while the search of Otto's car continued, Otto complained of chest pains, saying that his chest hit the steering wheel during the crash, and he offered to tell Trooper Morrell "where everything [wa]s." Trooper Morrell called for an ambulance.

Before the ambulance arrived, Otto told Trooper Morrell that he had two children, had been sober for seven years until December 2012, had lost his job, had relapsed with drugs, and was addicted. Trooper Morrell asked Otto when he had used drugs, and Otto responded that he had used drugs around nine or ten o'clock on the previous night. When

3

the ambulance arrived, medical personnel spoke with Otto as he sat in the squad car. With Trooper Morrell nearby, Otto told medical personnel that he used methamphetamine "yesterday." Medical personnel took Otto to a hospital, where Trooper Morrell later read the standard implied-consent advisory to Otto. Otto declined to consult with an attorney, agreed to submit to a blood test, and submitted to the test, which revealed the presence of methamphetamine in Otto's blood.

Respondent State of Minnesota charged Otto with first-degree controlled-substance crime and fourth-degree driving while impaired (DWI). Otto moved to suppress his inculpatory statements and "any and all evidence taken as a result of search and seizure." The district court conducted a contested omnibus hearing at which Officer Finch, Trooper Morrell, and Otto testified. The court suppressed Otto's inculpatory statements to Trooper Morrell, declined to suppress Otto's inculpatory statements to medical personnel, declined to suppress the physical evidence, and "reopen[ed] the hearing" to receive evidence and argument regarding the warrantless blood test.

The parties agreed to submit the blood-test issue to the district court on the basis of documentary evidence and any written submissions. The court declined to suppress the blood-test evidence. Otto then waived his jury and trial rights and stipulated to aspects of the state's case, and the parties submitted the case to the court under Minn. R. Crim. P. 26.01, subd. 4. The court found Otto guilty as charged and sentenced him to 135 months' imprisonment for first-degree controlled-substance crime and 90 days' concurrent confinement for fourth-degree DWI.

This appeal follows.

4

**D E C I S I O N**

"When reviewing a district court's pretrial order on a motion to suppress evidence, the district court's factual findings are reviewed under a clearly erroneous standard. But legal determinations, such as whether there was a seizure and, if so, whether that seizure was unreasonable, are reviewed de novo." *State v. Eichers*, 853 N.W.2d 114, 118 (Minn. 2014) (citation omitted), *cert. denied*, 135 S. Ct. 1557 (2015). "[Appellate courts] accept the district court's factual findings unless they are clearly erroneous." *State v. Smith*, 814 N.W.2d 346, 350 (Minn. 2012). "Findings of fact are clearly erroneous if, on the entire evidence, [the reviewing court is] left with the definite and firm conviction that a mistake occurred." *State v. Diede*, 795 N.W.2d 836, 846–47 (Minn. 2011). "Deference must be given to the district court's credibility determinations." *State v. Klamar*, 823 N.W.2d 687, 691 (Minn. App. 2012). "We will not reverse a correct decision by the district court simply because we disagree with its reasoning." *State v. Eichers*, 840 N.W.2d 210, 216 (Minn. App. 2013), *aff'd on other grounds*, 853 N.W.2d 114 (Minn. 2014).

*Investigatory detention*

Otto challenges the district court's conclusion that his investigatory detention was constitutional, first arguing that law enforcement did not have reasonable, articulable suspicion to stop his car. This argument is misguided because law enforcement did not stop Otto's car: it already was parked in the tavern's lot when Officer Finch located it, approached Otto, and asked him about the crash, and it still was parked when Trooper Morrell arrived on the scene and began questioning him about the crash.

5

"[C]ourts generally have held that it does not by itself constitute a seizure for an officer to simply walk up and talk to a person standing in a public place or to a driver sitting in an already stopped car." *State v. Vohnoutka*, 292 N.W.2d 756, 757 (Minn. 1980); *see also Klamar*, 823 N.W.2d at 693 (concluding that trooper's approach of already-stopped vehicle to check welfare of occupants was not seizure). Here, having been alerted to a serious crash involving Otto's car, Officer Finch and Trooper Morrell were entitled to approach the car in a commercial parking lot to check the welfare of its occupants and to offer help if necessary. *Cf. Kozak v. Comm'r of Pub. Safety*, 359 N.W.2d 625, 628 (Minn. App. 1984) (stating that "an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles" (citing *Vohnoutka*, 292 N.W.2d at 756)). Because Otto was not seized by Officer Finch's or Trooper Morrell's initial contact with him, we need not consider whether that contact was justified by reasonable, articulable suspicion of criminal activity.

But we conclude that Trooper Morrell's subsequent verbal attempts to restrict Otto's physical movements in the parking lot constituted an investigatory detention—i.e., a temporary seizure of Otto's person. *See State v. Hanson*, 504 N.W.2d 219, 220 (Minn. 1993) (stating that a seizure occurs when, "looking at all of the facts, the conduct of the police would communicate to a reasonable person in the defendant's physical circumstances an attempt by the police to capture or seize or otherwise to significantly intrude on the person's freedom of movement"); *see also Klamar*, 823 N.W.2d at 693 (concluding, in case involving welfare check, that seizure did not occur until trooper

6

ordered driver to exit vehicle and approach trooper's vehicle). We therefore consider whether reasonable, articulable suspicion of criminal activity justified that seizure. *See Smith*, 814 N.W.2d at 350 ("[Appellate courts] review de novo a district court's determination of reasonable suspicion of illegal activity.").

Under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), a police officer may

> temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity. Reasonable suspicion must be based on specific, articulable facts that allow the officer to be able to articulate at the omnibus hearing that he or she had a particularized and objective basis for suspecting the seized person of criminal activity. . . . A hunch, without additional objectively articulable facts, cannot provide the basis for an investigatory stop.

*Diede*, 795 N.W.2d at 842–43 (quotations and citations omitted). In this case, the district court found that

> [b]ased on [Trooper Morrell's] experience, [Otto]'s explanation regarding . . . why he hit a [utility] pole appeared inconsistent and suggested [Otto] may have been under the influence. Further, [Otto]'s body movement including moving to and from [his car] during his discussions with Officer Finch and Trooper Morrell indicated to Trooper Morrell, based on his experience, that [Otto] may be concerned about law enforcement discovering contraband in [his car]. In addition, [Otto] appeared nervous and was slow to react.

These findings are supported by Trooper Morrell's testimony, which the court expressly found credible. Otto does not specifically challenge the court's findings but points to portions of Trooper Morrell's testimony that purportedly show that Trooper Morrell acted on a bare "hunch" rather than on the observable facts identified in other portions of the testimony.

7

"To be reasonable, the basis of the officer's suspicion must satisfy an objective, totality-of-the-circumstances test." *Smith*, 814 N.W.2d at 351; *see also State v. Jackson*, 742 N.W.2d 163, 179 (Minn. 2007) ("An individual officer's subjective state of mind is not the relevant consideration."). The test is "whether the facts available to the officer at the moment of the seizure would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Smith*, 814 N.W.2d at 351−52 (quotations omitted). Here, Trooper Morrell had about two decades of law-enforcement experience, which was "heavy into DWI enforcement" and included "hundreds" of impaired-driving investigations, and he had training regarding standardized field-sobriety testing and indicia of impairment by alcohol or controlled substances. He also had conducted investigations, numbering "possibly in the hundreds," that led to charges of controlled-substance crime. Regardless of Trooper Morrell's subjective state of mind, Otto's demeanor and behavior would have led an officer with Trooper Morrell's training and experience to reasonably suspect Otto of criminal activity related to controlled substances. We conclude that reasonable, articulable suspicion supported Otto's investigatory detention.

Otto also argues that Trooper Morrell's questions regarding items on Otto's person were equivalent to a *Terry* frisk that lacked the required officer-safety justification or otherwise impermissibly expanded the scope of the investigatory detention. Otto is correct that a *Terry* frisk is justified by a reasonable, articulable suspicion that the suspect is armed and dangerous. *State v. Lemert*, 843 N.W.2d 227, 230 (Minn. 2014). But he offers no support for his conflation of a *Terry* frisk—that is, "a carefully limited search of the outer clothing to discover weapons which might be used against the officer," *State v. Wiggins*,

8

788 N.W.2d 509, 513 (Minn. App. 2010) (quotation omitted), *review denied* (Minn. Nov. 23, 2010)—and open-ended verbal questions regarding items on a suspect's person. Because Trooper Morrell's questions were a reasonable and incremental step in his investigation of suspected criminal activity related to controlled substances, and regardless of Trooper Morrell's subjective motivation for asking the questions, the questions did not impermissibly expand the scope of Otto's investigatory detention.

*Warrantless blood test*

Otto challenges the warrantless test of his blood, acknowledging that he verbally and physically consented to the test but asserting that Trooper Morrell coerced his consent by "false[ly] threat[ening]" him that withholding consent is a crime and by asking him for consent "in the radiology room of a hospital while Otto was receiving treatment for injuries sustained during a major traffic accident." Otto also notes that he did not consult with an attorney before giving consent and claims a causal link between Trooper Morrell's elicitation of inadmissible inculpatory statements from Otto regarding his drug use and Trooper Morrell's later success in obtaining Otto's consent to a test of his blood for drugs.

> Taking [a] blood . . . sample[] from someone constitutes a "search" under the Fourth Amendment. But police do not need a warrant if the subject of the search consents.
>
> For a search to fall under the consent exception, the State must show by a preponderance of the evidence that the defendant freely and voluntarily consented.

*State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013) (citations omitted). The voluntariness of a defendant's consent to chemical testing is assessed under "the totality of the circumstances, including the nature of the encounter, the kind of person the defendant is,

9

and what was said and how it was said." *Id.* at 569 (quotation omitted). "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact." *Diede*, 795 N.W.2d at 846 (quotation omitted).

Here, the district court considered Otto's arguments and found that "the taking of [Otto]'s blood was consensual as part of the Implied Consent statutory scheme." In an opinion issued after the district court's ruling, the United States Supreme Court held that a state may not constitutionally criminalize a driver's refusal to submit to a warrantless blood test, even where the driver was arrested lawfully for DWI, absent case-specific exigent circumstances justifying the state's failure to seek a search warrant. *Birchfield v. North Dakota*, No. 14-1468, 2016 WL 3434398, at \*12, \*25–27 (U.S. June 23, 2016). The implied-consent advisory that Trooper Morrell read to Otto therefore was partially inaccurate insofar as it conveyed to Otto that withholding consent to a warrantless blood test is a crime. *See id.* at \*27 (noting that defendant "submitted to a blood test after police told him that the law required his submission," labeling as "erroneous" state court's assumption that state permissibly could compel warrantless blood test, and characterizing as "partial[ly] inaccura[te]" advisory given to defendant).

The partial inaccuracy of the implied-consent advisory is one circumstance in the totality of the circumstances faced by Otto when he agreed to take a blood test. *See id.* (noting that state court "held that [defendant]'s consent was voluntary on the erroneous assumption that the State could permissibly compel both blood and breath tests," reiterating that "voluntariness of consent to a search must be determined from the totality of all the

10

circumstances," and directing state court "to reevaluate [defendant]'s consent given the partial inaccuracy of the officer's advisory" (quotation omitted)); *cf. Brooks*, 838 N.W.2d at 569 (stating that the totality of the circumstances includes "what was said and how it was said" (quotation omitted)). Yet the partial inaccuracy of the advisory was not considered by the district court, which lacked the guidance provided by the recent *Birchfield* opinion.

We therefore reverse the district court's judgment as to Otto's DWI conviction and sentence, and we remand to the district court to reassess the voluntariness of Otto's consent to the blood test in light of all the relevant circumstances, including the partial inaccuracy of the advisory, and to consider the applicability, if any, of the good-faith exception to the exclusionary rule. *See Birchfield*, 2016 WL 3434398, at *27 & n.9 (vacating judgment of state court, remanding for state court "to reevaluate [defendant]'s consent given the partial inaccuracy of the officer's advisory," and noting that state court "will have to address whether the evidence obtained in the search must be suppressed" if state court finds on remand that defendant did not voluntarily consent to blood test).

**Affirmed in part, reversed in part, and remanded.**