*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1023**

State of Minnesota,
Respondent,

vs.

La'Rog Daquan Meadows,
Appellant.

**Filed July 14, 2014
Affirmed
Willis, Judge***

Ramsey County District Court
File No. 62-CR-12-7303

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Elizabeth Lamin, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Connolly, Judge; and Willis, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**WILLIS**, Judge

Appellant challenges his conviction of possessing a firearm while ineligible, arguing that the district court (1) erred by not suppressing evidence seized without a warrant or reasonable suspicion; (2) erred by not dismissing the complaint because the statute under which he was charged was unconstitutional; (3) erred by admitting hearsay under the residual-hearsay exception; and (4) abused its discretion by not providing the jury with an accomplice-liability instruction. He also argues that the district court imposed cruel and unusual punishment by imposing the mandatory-minimum sentence without considering that he was a juvenile. We affirm.

**FACTS**

On August 6, 2012, St. Paul Police Department Officers Nelson, Yunker, and Tamm arrived in squad cars to the intersection of Arlington and Desoto in Saint Paul in response to a 911 call. Officers Nelson and Yunker saw a young man, later identified as appellant La'Rog Meadows, standing at the intersection and matching the caller's description of the person who was the reason for the 911 call. S.D., his girlfriend, soon joined him. Officer Yunker asked Meadows to approach, but Meadows and S.D. walked away. Officers Nelson and Yunker repeatedly told them to stop, but they sped up. The officers saw Meadows hand something to S.D. Officer Nelson chased Meadows and brought him to the ground. When Officer Yunker asked S.D. what Meadows handed her, she shook her shirt and a sock fell to the ground. Officer Yunker picked it up and

discovered that it contained a firearm. When Sergeant Gray interviewed S.D. later that day, she admitted that Meadows handed her "[a] gun" that he put "in his sock."

Meadows was charged with possessing a firearm while ineligible. He moved the district court to dismiss the complaint, arguing that the firearm prohibition violated his rights to keep and bear arms and to be free from cruel and unusual punishment and that the evidence should be suppressed because he was seized without a warrant or reasonable suspicion. The court held no evidentiary hearing, but rather, Meadows and the state "agreed that the police reports would be submitted, the recordings of the 911 calls would be submitted, and also the statement of [S.D.]" The court denied Meadows's motion.

Meadows stipulated to having a prior terroristic-threats adjudication, which made him ineligible to possess a firearm under Minn. Stat. §§ 624.712, subd. 5, 624.713, subd. 1(2) (2010). The state gave notice of its intent to introduce statements that S.D. made during her post-incident interview, which the district court admitted under the residual-hearsay exception. The court denied Meadows's motion to provide the jury with an accomplice-liability instruction. At trial, the state presented evidence that Meadows handed S.D. a sock containing a gun when Officer Nelson pursued them, but Meadows and S.D. testified that he handed her only a cellular phone. The jury found Meadows guilty.

Before sentencing, Meadows moved the district court to downwardly depart dispositionally or durationally based on the Eighth Amendment. At a sentencing hearing, the court denied his motion and imposed a 60-month sentence.

This appeal follows.

# DECISION

## I. The district court did not err by declining to suppress evidence obtained as a result of Meadows's seizure.

Meadows challenges the district court's denial of his motion to suppress evidence obtained as a result of his warrantless seizure. "The United States and Minnesota Constitutions protect '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011) (quoting U.S. Const. amend. IV, citing Minn. Const. art. I, § 10). "Evidence obtained as a result of a seizure without reasonable suspicion must be suppressed." *Id.* When reviewing pretrial orders on suppression motions, we review for clear error the district court's factual findings, review de novo its legal determination, *State v. Milton*, 821 N.W.2d 789, 798 (Minn. 2012), and review de novo its "determination of reasonable suspicion of illegal activity," *State v. Smith*, 814 N.W.2d 346, 350 (Minn. 2012).

The district court concluded that "the police did not seize . . . Meadows until they grabbed him and put him on the ground." But Meadows argues, and the state agrees, that the seizure occurred when Officers Nelson and Yunker told Meadows to stop.[1] *See In re Welfare of E.D.J.*, 502 N.W.2d 779, 780 (Minn. 1993) (holding that "[p]olice officer's directive to person to stop constituted a 'seizure' of the person under Minn. Const. art. I, § 10"). The issue is whether the officers had reasonable suspicion when they seized Meadows.

---

[1] The reports and testimonies of Officers Nelson and Yunker were conflicting as to which officer first arrived and which officer first told Meadows to stop.

4

A "police officer . . . [may] stop and temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity." *Diede*, 795 N.W.2d at 842 (quotation omitted). "The reasonableness of the actions of the police is an objective inquiry based on the collective knowledge of the officers." *State v. Jenkins*, 782 N.W.2d 211, 221 (Minn. 2010). "[T]he reasonable suspicion standard is not high" and "less demanding than probable cause or a preponderance of the evidence." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quotations omitted). A tip from a "reliable informant" can provide reasonable suspicion if it "bear[s] indicia of reliability that make the alleged criminal conduct sufficiently likely to justify an investigatory stop by police." *Id.* at 393–94. We "presume that tips from private citizen informants are reliable," "especially . . . when informants give information about their identity so that the police can locate them if necessary." *Id.* at 394 (quotation omitted).

The state offered evidence of a woman's two 911 calls and reports from Officers Nelson and Yunker. The 911 caller identified herself by name and asked the police to "pick . . . up" a man who was standing by himself at the intersection of DeSoto and Arlington near an address that she provided. She stated three times that he was not supposed to be there, stated that he might have recently helped to murder her children's father, and stated that he had been sneaking in and out of her neighbor's window for months. She did not know his name but described his race, approximate age and height, hair color, shirt, and pants. Officer Nelson knew that about a month earlier a homicide

5

occurred at the address given by the caller, and he believed that the caller "indicated a neighbor ha[d] a restraining order on suspect."

Although Meadows challenges the reliability of the 911 caller's tip, we presume that the tip was reliable because the caller gave her name and sufficient information for the police to locate her. *See Magnuson v. Comm'r of Pub. Safety*, 703 N.W.2d 557, 560 (Minn. App. 2005) (concluding that tip had sufficient indicia of reliability because informant gave her name and telephone number). Moreover, Meadows matched the caller's description, Officer Nelson knew that a murder occurred at the address given by the caller, and Meadows was evasive when approached by the officers. *See State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992) ("[O]ne circumstance giving rise to reasonable suspicion is evasive conduct."), *aff'd*, 508 U.S. 366, 113 S. Ct. 2130 (1993).

The district court concluded that the officers had reasonable suspicion based on the circumstances, including their belief that Meadows was violating "a restraining order" held by "the individual." The only basis for that belief revealed by the record is an "INCIDENT RECALL" document bearing various 911 operators' names, which states, "COMP INDICATED A NEIGHBOR HAS A RESTRAINING ORDER AGAINST THE SUSP." Officer Nelson's report states: "The call comments read as follows: . . . Comp indicated a neighbor has a restraining order on suspect." But the caller did not say that a restraining order existed. Rather, the operator appears to have inferred its existence from the caller stating three times that Meadows was not supposed to be in the area, stating "he's not supposed to be around here anyway cuz he busted out Laticia's window," "[h]e not even supposed to be around here," and "[h]e don't even supposed to be over here."

6

We are not persuaded that the officers' suspicion that Meadows was violating a restraining order was unreasonable simply because it was incorrect. The reasonable-suspicion standard requires only that the officers reasonably suspected Meadows of criminal activity. *Diede*, 795 N.W.2d at 842; *see, e.g.*, *City of St. Paul v. Vaughn*, 306 Minn. 337, 337, 237 N.W.2d 365, 366 (1975) (stating that police reasonably attempted to stop automobile even though "they did so on the basis of information that the driver's license of the person they mistakenly believed to be operating the automobile was suspended").

Meadows argues that "[b]asing a warrantless seizure on incorrect information violates the Fourth Amendment and article one, section ten of the Minnesota Constitution." But none of the cases that he cites supports that proposition. Moreover, permitting an officer to rely on a 911 operator's reasonable but erroneous inference is not, as he suggests, the equivalent of relying on the good-faith exception to the exclusionary rule, which our supreme court has "consistently declined to adopt." *State v. Jackson*, 742 N.W.2d 163, 180 n.10 (Minn. 2007). Rather, it is consistent with the general rule that investigatory stops require only reasonable, articulable suspicion of criminal activity. *See, e.g.*, *State v. Anderson*, 683 N.W.2d 818, 822–23 (Minn. 2004) (stating general rule).

We conclude that the district court did not err by declining to suppress the evidence obtained as a result of Meadows's seizure because at the time of the seizure the officers reasonably suspected that Meadows was violating a restraining order.

7

**II.** **The district court's failure to dismiss the complaint did not violate Meadows's rights to keep and bear arms and to be free from cruel and unusual punishment.**

Section 624.713, subdivision 1(2), generally prohibits "a person . . . adjudicated delinquent . . . for committing . . . a crime of violence" from "possess[ing] a . . . firearm." Meadows argues that the statute, as applied to him, violates the Second and Eighth Amendments to the United States Constitution. We disagree.

> [Appellate courts] review a constitutional challenge to a statute de novo. We presume statutes to be constitutional and exercise the power to declare a statute unconstitutional with extreme caution and only when absolutely necessary. As a result, we uphold a statute unless the challenging party demonstrates that the statute is unconstitutional beyond a reasonable doubt.

*State v. Craig*, 826 N.W.2d 789, 791 (Minn. 2013) (quotation and citation omitted).

"[T]he Second Amendment conferred an individual right to keep and bear arms." *D.C. v. Heller*, 554 U.S. 570, 595, 128 S. Ct. 2783, 2799, (2008); *see McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010) (holding that Second Amendment extends to states). But "[f]elon-dispossession statutes, which prohibit felons from possessing firearms, are presumptively lawful because felons fall outside the scope of the Second Amendment's protection." *Craig*, 826 N.W.2d at 790. Felons may challenge such statutes as applied to them if they "present[] facts that distinguish [their] conviction from the convictions of other felons who are categorically unprotected by the Second Amendment as historically understood." *Id.* Meadows attempts to distinguish his circumstances because the prohibition against his possessing a firearm was based on a juvenile adjudication, stressing that "[d]eciding that a juvenile offender forever will be a danger to

8

society would require making a judgment that he is incorrigible—but incorrigibility is inconsistent with youth." *Miller v. Alabama*, 132 S. Ct. 2455, 2465 (2012) (quotations omitted). But his terroristic-threats adjudication, during which he threatened others with a firearm, was a violent crime. Minn. Stat. § 624.712, subd. 5. A person who commits a violent crime is "more dangerous than a typical law-abiding citizen" and "more likely to reoffend and commit further crimes of violence that threaten the public safety." *Craig*, 826 N.W.2d at 797. Meadows provides no indication that, when adjudicated, he was sufficiently less dangerous and less likely to reoffend than typical felons who fall outside of the scope of the Second Amendment. *Cf. State v. McFee*, 721 N.W.2d 607, 613–14 (Minn. 2006) ("While originally juvenile adjudications could not be used in any other proceeding, the legislature has now provided for use of juvenile adjudications as predicate offenses and as enhancements in a variety of criminal contexts." (citation omitted)).

Meadows argues that the statute's firearm-possession ban, as applied to him, violated the Eighth Amendment's prohibition against "cruel and unusual punishments." But the ban is not punishment. Rather, "[i]neligibility to possess a firearm is a collateral consequence of a conviction," *State v. Turnbull*, 766 N.W.2d 78, 81 (Minn. App. 2009), and "[g]enerally, collateral consequences 'are not punishment' but are 'civil and regulatory in nature and are imposed in the interest of public safety,'" *State v. Crump*, 826 N.W.2d 838, 842 (Minn. App. 2013) (quoting *Kaiser v. State*, 641 N.W.2d 900, 905–07 (Minn. 2002)), *review denied* (Minn. May 21, 2013).

We conclude that the district court did not err by rejecting Meadows's Second and Eighth Amendment challenges to section 624.713, subdivision 1(2).

### III. The district court did not err by admitting S.D.'s hearsay statement under the residual-hearsay exception.

Meadows challenges the district court's admission of S.D.'s statement to Sergeant Gray that, after Officers Nelson and Yunker told them to stop walking away, Meadows handed her a gun in a sock. The district court admitted that hearsay under the residual-hearsay exception. At trial, S.D. provided contrary testimony, testifying that Meadows handed her only a cellular phone and that the gun seized by police belonged to her.

Although Meadows objected to the state's pretrial hearsay notice, he did so based on a claim that the notice provided inadequate details, which the state remedied; Meadows's counsel later told the district court, "I didn't make any hearsay objections." "[W]e may consider an error not objected to at trial if there was (1) error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." *State v. Tscheu*, 758 N.W.2d 849, 863 (Minn. 2008). We reject Meadows's challenge because we conclude under the first prong of the plain-error test that the district court did not abuse its discretion by admitting S.D.'s hearsay statement. *See State v. Hayes*, 826 N.W.2d 799, 808 (Minn. 2013) (declining to "consider the remaining prongs of the plain-error test" after concluding that "the district court did not abuse its discretion in admitting the challenged testimony"); *State v. Jenkins*, 782 N.W.2d 211, 230–31 (Minn. 2010) (concluding in context of plain-error review that "the district court did not abuse its

10

discretion or commit any error when it granted the State's motion to exclude the evidence on relevance grounds").

Hearsay is generally inadmissible under Minn. R. Evid. 802, but Minn. R. Evid. 807, the residual-hearsay exception, provides:

> A statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

A totality-of-the-circumstances analysis requires a determination of whether the hearsay had circumstantial guarantees of trustworthiness equivalent to Minn. R. Evid. 803 and 804:

> In particular, the court should generally consider the following factors in evaluating trustworthiness: [(1)] whether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; [(2)] the declarant's relationship to the parties; [(3)] the declarant's motivation to make the statement; [(4)] the declarant's personal knowledge; [(5)] whether the declarant ever recanted the statement; [(6)] the existence of corroborating evidence; [(7)] and the character of the declarant for truthfulness and honesty.

*State v. Griffin*, 834 N.W.2d 688, 693 (Minn. 2013) (quotation omitted). Three other factors identified by the supreme court are (8) "there was no confrontation problem as the declarant testified, admitted making the prior statement, and was available for cross-examination by the defense counsel"; (9) "as the declarant admitted making the statement and the statement was taped, there was no real dispute about what the declarant had said";

11

and (10) "the statement was against the declarant's penal interest, which increased its reliability." *Holt v. State*, 772 N.W.2d 470, 483 (Minn. 2009).

The district court did not make a record of its analysis of those factors. But we conclude that, except for factors 5 and 7, the factors favor admission of S.D.'s hearsay statement. Factors 5 and 7 disfavor admission because S.D. testified that Meadows handed her a cellular phone and not a gun, contrary to her earlier statement to police that Meadows handed her a gun. Factor 1 favors admission because, although S.D. did not give her statement under oath or subject to cross-examination or the penalty of perjury, she provided the statement after voluntarily waiving her *Miranda* rights. Factors 2 and 3 favor admission because, although S.D. testified that she lied in her statement to Sergeant Gray because Officer Tamm told her that she was going to need to "serve five years in jail" for possessing the gun, S.D. made the statement while she was in a romantic relationship with Meadows and pregnant with his child. Factor 4 favors admission because S.D. had personal knowledge of the incident. Factor 6 favors admission because the testimony of Officers Nelson, Yunker, and Tamm corroborated S.D.'s hearsay. Factor 8 favors admission because S.D. testified and admitted to the prior statement's existence, although she denied portions of it. Factor 9 favors admission because the recording of the statement left no dispute as to what S.D. said. And factor 10 favors admission because, by admitting to receiving the gun from Meadows, S.D. implicated herself as an accessory after the fact. *See* Minn. Stat. § 609.495, subd. 1(a) (2012) (criminalizing "assist[ing] by word or acts another whom the actor knows or has reason to know has committed a crime").

12

We conclude that the district court did not err or abuse its discretion by admitting S.D.'s hearsay statement under the residual-hearsay exception.

**IV.    The district court did not abuse its discretion by declining to provide the jury with an accomplice-liability instruction.**

We review for an abuse of discretion the district court's "refusal to give a requested jury instruction." *State v. Scruggs*, 822 N.W.2d 631, 640 (Minn. 2012). Meadows moved the district court to include an accomplice-liability jury instruction because S.D. was an accomplice. The district court denied his motion, reasoning that the instruction "would only cause confusion for the jury and would not assist them in this case." Meadows argues that the district court abused its discretion. We disagree.

"District courts must instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider that a witness testifying against the defendant is an accomplice." *State v. Cox*, 820 N.W.2d 540, 548 (Minn. 2012). But "an accessory after the fact is not guilty as an accomplice." *Id.* at 550. "[H]is offense is instead that of interfering with the processes of justice," *State v. Skipintheday*, 717 N.W.2d 423, 427 (Minn. 2006) (quotation omitted); *see, e.g.*, *Scruggs*, 822 N.W.2d at 641 ("[L]ying to the police is after-the-fact assistance, which is not relevant to an accomplice determination." (quotation omitted)).

Meadows argues that S.D. was "clearly an accomplice" because she told the police that Meadows gave her the firearm and because she held the firearm for him when the police approached. But no record evidence shows that she had any involvement in Meadows's acquisition of the firearm; the only relevant record evidence shows that, after

13

the police ordered Meadows and S.D. to stop, Meadows passed the firearm to S.D., which she retained until questioned by Officer Yunker. She was, therefore, an accessory after the fact, not an accomplice. *See State v. Pietraszewski*, 283 N.W.2d 887, 892 (Minn. 1979) ("In the instant case there is no evidence that Hess had any involvement with the crime before he hid the gun and ammunition. At most he can be considered an accessory after the fact.").

This case is unlike *State v. Davis*, 685 N.W.2d 442, 444 (Minn. App. 2004), *review denied* (Minn. Oct. 27, 2004), on which Meadows relies, in which the alleged accomplice stated that he handed the gun to Davis. No record evidence indicates that S.D. gave the gun to Meadows; rather, he gave it to her after the officers told him to stop.

We conclude that the district court did not abuse its discretion by declining to provide the jury with an accomplice-liability instruction.

**V.     The district court's imposition of the mandatory-minimum sentence did not constitute cruel and unusual punishment.**

> [Appellate courts] review a constitutional challenge to a statute de novo. We presume statutes to be constitutional and exercise the power to declare a statute unconstitutional with extreme caution and only when absolutely necessary. As a result, we uphold a statute unless the challenging party demonstrates that the statute is unconstitutional beyond a reasonable doubt.

*Craig*, 826 N.W.2d at 791 (quotation and citation omitted).

Meadows argues that section 609.11, subdivision 5(b), as applied to him, is unconstitutional cruel and unusual punishment under the Eighth Amendment because he claims that the statute did not permit the district court "the discretion to consider

14

characteristics unique to [Meadows] as a juvenile when imposing the sentence." He relies on the Supreme Court's statement in *Miller* that:

> in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. . . . Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.

132 S. Ct. at 2468. His argument is unpersuasive.

Our supreme court recently held that "[a] mandatory sentence of life with the possibility of release for a juvenile is not unconstitutional under the rule announced in *Miller*" because it "does not require the imposition of the harshest term of imprisonment: life imprisonment without the possibility of release." *Ouk v. State*, ___ N.W.2d ___, ___, 2014 WL 2599653, at *1, *3 (Minn. June 11, 2014). Moreover, "[e]ven if an offender is subject to a mandatory minimum sentence [under section 609.11], the district court may still sentence a defendant "without regard to the mandatory minimum . . . if the court finds substantial and compelling reasons to do so." *State v. Mayl*, 836 N.W.2d 368, 371 (Minn. App. 2013) (quoting Minn. Stat. § 609.11, subd. 8(a) (2010)), *review denied* (Minn. Nov. 12, 2013). Minnesota Statutes section 609.11, subdivision 8(b) (2012), provides that the district court lacks discretion to depart from the mandatory-minimum sentence if the defendant had a prior conviction of an offense listed in subdivision 9. Meadows did not have such a prior conviction. But the district court stated, "I [do not] find that there are compelling reasons to depart from the mandatory sentence, as difficult, frankly, as that has been for me." And the court expressly considered the fact that

Meadows was, at the time of sentencing, 17 years old and, based on the court's calculations, would be out of prison "by the age of 20, which gives him a whole life to change, if he decides to change."

Therefore, Meadows's Eighth Amendment challenge to section 609.11, subdivision 5(b), is unpersuasive.

**Affirmed.**